USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-2034 UNITED STATES OF AMERICA, Appellee, v. JOSE HERNANDEZ, Defendant, Appellant. _____________________ No. 91-2035 UNITED STATES OF AMERICA, Appellee, v. AGUILINO JOSE SANCHEZ, Defendant, Appellant. _____________________ No. 91-2036 UNITED STATES OF AMERICA, Appellee, v. JORGE L. SOSTRE, Defendant, Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, U.S. District Judge] ___________________ ____________________ Before Torruella, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Robert R. Anderson for appellant Hernandez. __________________ Ernest Barone for appellant Sanchez. _____________ Joel D. Landry for appellant Sostre. ______________ Margaret E. Curran, Assistant United States Attorney, with whom ___________________ Lincoln C. Almond, United States Attorney, James H. Leavey, Assistant __________________ _______________ United States Attorney, and Kenneth P. Madden, Assistant United States _________________ Attorney, were on brief for appellee. ____________________ May 12, 1993 ____________________ CYR, Circuit Judge. Following trial, defendants Jose CYR, Circuit Judge. _____________ Hernandez, Aguilino Jose Sanchez, and Jorge Luis Sostre (herein- after, collectively: "appellants") were convicted and sentenced on various charges arising out of an undercover cocaine transac- tion in Providence, Rhode Island. Finding no error, we affirm. I I BACKGROUND BACKGROUND __________ In February 1991, Rodrigo Sostre ("Rodrigo"), through an intermediary, offered to sell a kilogram of cocaine to Frdy Vegas, a paid DEA informant. While consulting with his usual cocaine source, one Luis Guillermo Santiago-Martinez, Rodrigo repeatedly spoke by telephone with Vegas between February 15 and February 19, finally arranging for the drug transaction to take place at Rodrigo's apartment on the afternoon of February 19. At 2:00 p.m. on February 19, Rodrigo and his brother Jorge Luis Sostre ("Jorge") met Vegas and an undercover DEA agent, Anthony Roberto, on the front porch of Rodrigo's apartment building. Agent Roberto asked Rodrigo if "everything [was] ready," and Rodrigo responded that "the people were on their way." Rodrigo went upstairs to his second floor apartment to phone his "source." When he returned to the porch, Rodrigo stated that the cocaine was of good quality, and that his neigh- borhood was a much safer place for a drug transaction because 3 there was "less police activity." Jorge agreed with his brot- her's assessment. At 2:15 the cocaine had not yet arrived, and Rodrigo returned to his apartment to make another phone call. Jorge, who remained on the front porch with Vegas and Agent Roberto, stated: "I don't blame you guys to leave [sic], you've got a lot of money and that's a lot of merchandise to be waiting around for." Rodrigo returned, informing Vegas and Agent Roberto: "they [are] on their way." After a third unsuccessful phone call by Rodrigo, Vegas told the Sostre brothers that he would wait at a nearby store until notified by beeper that the cocaine had arrived. In the meantime, DEA agents observed appellants Sanchez and Hernandez as they arrived by car at the residence of Santia- go-Martinez, Rodrigo's usual drug supplier. Santiago-Martinez entered the back seat of the car, which then proceeded to Ro- drigo's apartment, arriving at approximately 2:54. At approxi- mately the same time, Vegas's beeper was activated, and he returned with Agent Roberto to Rodrigo's apartment house, where the Sostre brothers met them on the front porch. Rodrigo brought them upstairs, while Jorge remained on the porch. Once inside the upstairs apartment, Rodrigo locked the door. Sanchez, Santiago-Martinez, and Hernandez were inside the apartment as well, standing around a table upon which lay a one-kilogram package of cocaine which later tested 94% pure. Agent Roberto inquired in Spanish: "Why do you need three people?" Sanchez responded in Spanish: "That's the way I do business." After 4 inspecting the cocaine, Agent Roberto went out to his car, ostensibly to get the $28,000 purchase money, and signalled for the waiting DEA agents to raid the apartment. Just after the raid commenced, DEA agents saw Jorge walk off the front porch "in a rapid manner," then "start casually slowing down and walking up the sidewalk." Jorge was arrested, as were Rodrigo, Santiago- Martinez, Sanchez, and Hernandez. Hernandez had a loaded semi- automatic in his possession at the time of his arrest. The five- count indictment followed, and Hernandez, Sanchez, and Jorge Sostre were convicted on all charges.1 II II DISCUSSION DISCUSSION __________ A. Hernandez' Appeal. A. Hernandez' Appeal. _________________ Hernandez challenges the district court's refusal to instruct the jury that he could not be convicted on Count 3 (using or carrying a firearm during and in relation to a drug ____________________ 1The original indictment charged appellants, along with Santiago-Martinez and Rodrigo Sostre, in two counts: Count 1 (conspiracy to distribute and to possess with intent to dis- tribute, 21 U.S.C. 846) and Count 2 (possession of cocaine with intent to distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. ___ 2). Only Sanchez and Jorge appeal their convictions on counts 1 and 2. The indictment charged Hernandez and Sanchez in two counts: Count 3 (using or carrying a firearm during and in relation to a drug trafficking offense, 18 U.S.C. 924(c)(1); id. 2), and ___ Count 4 (possession of a firearm by an illegal alien, id. 922- ___ (g)(5); id. 2). After trial, Sanchez won a judgment of acquit- ___ tal on Count 3. Hernandez appeals his conviction under Count 3. The government dismissed Count 4 prior to trial. Finally, Sanchez appeals his conviction under Count 5 (possession of a firearm by a convicted felon, id. 922(g)(1); id. 2). ___ ___ 5 trafficking offense, 18 U.S.C. 924(c)(1)) for "mere possession" of a firearm, but that the government was required to prove that the firearm was an "integral part" of the offense, or that his possession of it was made known to others present during the drug _____ transaction.2 These arguments are without merit. The challenged instruction recited the corresponding principles that a conviction under section 924(c) would not be warranted for "mere possession," and that the jury must find that the firearm "facilitated" the crime.3 As the district court suggested, the "facilitation" element of section 924(c) would depend on whether Hernandez' intent was reasonably inferable from the totality of the circumstances, which is "a matter for a [trier of fact] applying common sense theories of human nature and causation." United States v. Plummer, 964 F.2d 1251, 1255 _____________ _______ ____________________ 2Hernandez' proposed instruction provided, in its entirety: "Possession of a firearm constitutes use in relation to drug trafficking offense if possession is [sic] integral part of, and facilitates commission of, drug trafficking offense." 3The jury was instructed that: The term "used or carried a firearm" includes the act of carrying, wearing, or using a firearm. The firearm must be within the Defendant's reach at the time of the offense. Mere possession of a firearm is not sufficient proof. The government must prove the firearm facilitat- ed the drug-trafficking crime. To facilitate is a [sic] crime does not require actual use of a firearm. Howev- er, a Defendant may not be convicted of this offense unless the jury finds beyond a reasonable doubt from the circumstances, the Defendant intended to use the ________ __ ___ firearm if a contingency arose potentially requiring its use or that the Defendant intended to use it to possibly facilitate escape should the need arise. (Emphasis added.) 6 (1st Cir.) (quoting United States v. Wilkinson, 926 F.2d 22, 26 ______________ _________ (1st Cir.1991)), cert. denied, 113 S. Ct. 350 (1992). Given the _____ ______ $28,000 in cash being exchanged for the kilogram of cocaine, as well as Hernandez' proximity to the cocaine during the exchange and the fact that there was a bullet in the chamber of the gun, the challenged instruction provided adequate guidance on "facili- tation." As to Hernandez' second contention, it is simply not a correct statement of the law that the presence of a firearm used to "facilitate" a drug trafficking offense need be made known to other participants in the transaction. See United States v. ___ _____________ Abreu, 952 F.2d 1458, 1466 (1st Cir.), cert. denied, 112 S. Ct _____ _____ ______ 1695 (1992); United States v. Hadfield, 919 F.2d 987, 997 (1st _____________ ________ Cir. 1990), cert. denied, 111 S. Ct. 2036 (1991); see also United _____ ______ ___ ____ ______ States v. Jones, 965 F.2d 1507, 1514-15 (8th Cir.), cert. denied, ______ _____ _____ ______ 113 S. Ct. 346 (1992); United States v. Contreras, 950 F.2d 232, ______________ _________ 241 (5th Cir. 1991), cert. denied, 112 S. Ct. 2276 (1992); United _____ ______ ______ States v. Torres-Medina, 935 F.2d 1047, 1049 (9th Cir. 1991); ______ _____________ United States v. Paz, 927 F.2d 176, 179 (4th Cir. 1991); United _____________ ___ ______ States v. Torres, 901 F.2d 205, 217 (2d Cir. 1990); United States ______ ______ _____________ v. McKinnell, 888 F.2d 669, 674-75 (10th Cir. 1989); United _________ ______ States v. Acosta-Cazares, 878 F.2d 945, 951 (6th Cir.), cert. ______ ______________ _____ denied, 493 U.S. 899 (1989). The challenged instruction provided ______ the jury with an accurate statement of the law. B. Sanchez' Appeal. B. Sanchez' Appeal. _______________ 7 Sanchez advances four claims on appeal, which we consider in turn. 8 1. Sufficiency of Evidence of Conspiracy and Possession. 1. Sufficiency of Evidence of Conspiracy and Possession. ____________________________________________________ Sanchez contends that the government did not introduce enough evidence to support his conviction under Count 1 (conspir- acy to distribute and to possess with intent to distribute, 21 U.S.C. 846) and Count 2 (possession of cocaine with intent to distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. 2), but that ___ the evidence instead proved "mere presence" at the site of the crime, and that he was therefore entitled to judgments of acquit- tal. On review of a district court ruling under Fed. R. Crim. P. 29, we evaluate the evidence, draw all reasonable inferences, and resolve all credibility determinations in the light most favor- able to the government. United States v. Yefsky, No. 90-1174, ______________ ______ slip op. at 6 (1st Cir. May ___, 1992); United States v. Wight, _____________ _____ 968 F.2d 1393, 1395 (1st Cir. 1992). Our review satisfies us that the jury supportably could have found, beyond a reasonable doubt, that Sanchez was the individual who transported the cocaine to Rodrigo's apartment on February 19, 1991. Vegas and Agent Roberto had asked to be summoned by beeper as soon as the cocaine arrived. They were summoned at approximately the same time Sanchez arrived at the apartment, giving rise to a reasonable inference that Sanchez was the "source," or that a person "in charge" of the transaction had finally arrived.4 Moreover, inside the apartment, it was San- ____________________ 4The record provides no direct support for the government's contention that the beeper was activated at precisely 2:55 p.m., i.e., one minute following Sanchez' and Hernandez' arrival at the ____ crime scene. We note, however, that Agent Roberto merely testi- fied that the beeper signal came at "approximately 2:50," and _____________ 9 chez who advised Agent Roberto: "That's the way I do business." In the circumstances revealed by the evidence, this admission would support a jury determination that Sanchez not only partici- pated in the transaction but was in charge of supplying the cocaine to Rodrigo for sale to Roberto.5 In an effort to negate the latter evidence, Sanchez contends that, without his alleged incriminatory statement to Agent Roberto, the government would not have had sufficient evidence to convict. Citing two allegedly erroneous evidentiary rulings, Sanchez argues that the district court improperly restricted his defense, by which he sought to establish that Agent Roberto was less than fluent in Spanish and may have mistranslated Sanchez' Spanish statement into English during direct examination at trial.6 ____________________ Vegas and Roberto, who were waiting at a nearby store, returned to Rodrigo's apartment at 2:58. 5Sanchez argues that Santiago-Martinez testified that Sanchez did not make this comment to Agent Roberto. To the extent this alleged conflict in testimony necessitated a credi- bility determination, we must presume the jury found Roberto more credible. Furthermore, Santiago-Martinez' testimony could be understood as indicating his lack of recollection ("I wasn't paying attention"), rather than as stating that no such comment was made. 6Roberto, a DEA agent since the early 1980s, testified that he had taken a four-month Spanish course in 1984, was stationed in Monterey, Mexico from 1984 through 1986, attended an advanced Spanish course in 1986, and used his Spanish language experience daily as a DEA agent. Sanchez does not appear to challenge the original admission of Roberto's interpretive testimony, to which defense counsel raised no objection at trial. Accordingly, we deem the issue waived. He merely argues that he should have been allowed more opportunity to impeach Roberto on cross-examination and on rebuttal. 10 The trial court has broad discretion over the scope and extent of cross-examination. United States v. Figueroa, 976 F.2d ______________ ________ 1446, 1457 (1st Cir. 1992); United States v. Berrio-Londono, 946 _____________ ______________ F.2d 158, 160 (1st Cir. 1991), cert. denied, 112 S. Ct. 1223 _____ ______ (1992). Sanchez contends that the district court cut short his cross-examination of Agent Roberto concerning his proficiency with the Spanish language. We do not agree. Out of the hearing of the jury, the district court merely questioned the relevancy of defense counsel's line of questioning, which had become mired in minute detail concerning the identity of Agent Roberto's neighbors while he was residing in Monterey during 1986. At no time did the court prohibit defense counsel from continuing the line of questioning, nor does the record reflect any objection to the district court's statements. In fact, when the jury was returned to the courtroom, defense counsel posed a follow-up question along the same line. There was no error. Sanchez also claims that his Sixth Amendment right to confrontation was violated by the court's refusal to allow him to call the person who was serving as the court-appointed interpret- er during Agent Roberto's direct examination.7 Sanchez argues ____________________ 7The court explained its ruling as follows: I was advised yesterday afternoon that the Interpreter whom we had here yesterday afternoon had been told to appear here today to testify. I advised, I sent work [sic] to him that he was not to come here today. I _ can't for the life of me understand why he would be _____ ___ ___ ____ __ __ __________ ___ __ _____ __ asked to testify in the first place. In the second _____ __ _______ __ ___ _____ ______ place, I'm not going to permit someone to come into this courtroom, and in front of the jury interpret testimony and then put that same person on the witness stand to give opinion testimony as to one's control of 11 that the interpreter could have testified that Roberto's transla- tion of Sanchez' incriminatory statement was unreliable, or that Sanchez' statement was susceptible to a less incriminating English rendition. However, defense counsel neither objected to the district court's exclusionary ruling nor made an offer of proof pursuant to Fed. R. Evid. 103(d), notwithstanding the court's express statement that it could not understand "why the [interpreter] would be asked to testify in the first place." See ___ supra note 7. Accordingly, we review for "plain error" affecting _____ the "fundamental fairness" of the trial. United States v. ______________ Tracy, Nos. 92-1459, 92-1461, 92-1554, 1993 U.S. App. LEXIS 6245, _____ at 12 (1st Cir. Mar. 29, 1993); United States v. McGill, 952 F.2d _____________ ______ 16, 18 (1st Cir. 1991). Sanchez argues that the interpreter's testimony was the only practicable way to convey to a non-Spanish-speaking jury the untrustworthiness of Agent Roberto's testimony. Even discounting defense counsel's unexplained failure to come forward with either an objection or the "invited" offer of proof, cf. Hernandez-Garza ___ _______________ v. INS, 882 F.2d 945, 948 (5th Cir. 1989) (immigration judge ___ erred by refusing to allow party to test INS agent's fluency in Spanish, and by dismissing party's observation "that a qualified ____________________ the Spanish language. That's vouching in the highest order. Anything else? (Emphasis added.) 12 interpreter was present"),8 Sanchez does not explain why it was necessary that the court-appointed interpreter testify, particu- larly in light of the district court's plainly stated concern that the interpreter might be placed in the position of appearing to vouch for or against a translation previously rendered in his role as court-appointed interpreter. Agent Roberto's proficiency in Spanish could as well have been tested on cross-examination9 or through an interpreter selected by the defense, as indeed could other possible translations of Sanchez' incriminating remark. Therefore, even if defense counsel believed the district court was adamantly opposed to calling the court-appointed inter- preter, there was no apparent reason for neither explaining the defense's position nor requesting a continuance to obtain an interpreter. Finally, since Sanchez has never suggested another English translation of the incriminating statement, there has been no showing of plain error. 2. Evidence of Constructive 2. Evidence of Constructive ____________________ 8At oral argument, Sanchez' counsel explained that not all objections can be made in "the heat of trial." Yet it is pre- cisely in the "heat of trial" that counsel's timely articulation of grounds for proposing or opposing the admission of evidence is most important to the trial court. Similarly, "[i]f lawyers could pursue on appeal issues not properly raised below, there would be little incentive to get it right the first time and no end of retrials." Poliquin v. Garden Way, Inc., ___ F.2d ___, ________ ________________ ___ (1st Cir. 1993) [Nos. 92-1115, 92-1116, slip op. at 8 (1st Cir. Mar. 24, 1993)]. 9Indeed, during his extended cross-examination of Agent Roberto, Sanchez' counsel was allowed great latitude, and engaged Roberto in a prolonged exercise in which he asked Roberto to give Spanish-English and English-Spanish translations for a series of common expressions. 13 Possession of Firearm. Possession of Firearm. _____________________ Sanchez argues that he could not be convicted on Count 5 (transportation of a firearm by a convicted felon, 18 U.S.C. 922(g)(1)) for "constructive possession" of Hernandez' firearm because the government introduced no direct evidence that Sanchez ______ knew that Hernandez was carrying it. Sanchez' argument depends ____ primarily on his unsuccessful attempt to undermine Agent Rob- erto's testimony concerning the incriminating statement Sanchez made on February 19, 1991. The government points out that since Sanchez proclaimed that he was in charge of the drug deal, he could be found to have "controlled" Hernandez. A reasonable inference could then be drawn that Hernandez was there at San- chez' behest to protect the drugs, and Sanchez. "[A]s long as a convicted felon knowingly has the power and the intention at a given time of exercising dominion and control over a firearm, . . . directly or through others, he is in [constructive] posses- __ _______ ______ sion of the firearm." United States v. Wight, 968 F.2d 1393, _____________ _____ 1398 (1st Cir. 1992) (emphasis added); see also United States v. ___ ____ _____________ McAnderson, 914 F.2d 934, 947-48 (7th Cir. 1990). The evidence __________ was sufficient to establish Sanchez' constructive possession of the firearm carried by Hernandez. 3. Entrapment Defense. 3. Entrapment Defense __________________ Sanchez contends that he was entitled to an entrapment instruction. Since there was no post-charge objection to the refusal to give an entrapment instruction, however, we review for plain error. See United States v. Arias-Santana, 964 F.2d 1262, ___ _____________ _____________ 14 1268 (1st Cir. 1992) (citing Fed. R. Crim. P. 52(b), which mandates renewed objection after court's charge and before jury retires to deliberate). The entrapment defense consists of two components: (1) government inducement of the crime, and (2) an absence of predis- position on the part of the defendant to commit the alleged crime. United States v. Reed, 977 F.2d 14, 18 (1st Cir. 1992); _____________ ____ United States v. Tejeda, 974 F.2d 210, 217 (1st Cir. 1992). ______________ ______ Sanchez contends that the district court improperly required him to produce evidence of lack of predisposition, whereas the burden of production should have shifted to the government to prove predisposition once Sanchez established government inducement. The argument is irreparably flawed in at least two respects. First, Sanchez was entitled to an entrapment instruc- tion only if he first produced "some evidence" on both ele- ____ ments of the entrapment defense sufficient to raise a reason- able doubt as to whether he "was an 'unwary innocent' rather than an 'unwary criminal.'" Id. (quoting Mathews v. United States, ___ _______ _____________ 485 U.S. 58, 63 (1988)). Second, Sanchez produced no evidence of government inducement. Before he arrived at the scene of the drug transaction on February 19, 1991, Sanchez had no direct contact with any government agent. "[T]his court [has] refused to extend the entrapment defense to a defendant in contact only ____ with an intermediary, and not the government agent, absent 'a ____ __ ____________ showing that pressure had been put upon him by the intermediary at the instruction of the government agent.'" United States v. __ ___ ___________ __ ___ __________ _____ ______________ 15 Murphy, 852 F.2d 1, 6 (1st Cir. 1988) (quoting United States v. ______ _____________ Bradley, 820 F.2d 3, 8 (1st Cir. 1987)) (emphasis added), cert. _______ _____ denied, 489 U.S. 1022 (1989); see also United States v. McKenna, ______ ___ ____ _____________ _______ 889 F.2d 1168, 1174 (1st Cir. 1989). Sanchez does not suggest, nor does the record disclose any evidence, that government agents even knew about Sanchez or his involvement in the offense prior to his arrival at the scene of the undercover drug buy, let alone that agents instructed anyone to pressure Sanchez to take part. Absent any evidence of government inducement, Sanchez was not entitled to a jury charge on entrapment, and the court committed no error, plain or otherwise. 4. Refusal to Depart. 4. Refusal to Depart _________________ Finally, citing 18 U.S.C. 3553 ("The court shall impose a sentence sufficient, but not greater than necessary ____________________________ . . . .") (emphasis added), Sanchez says the district court erred in refusing to depart below the "excessive" thirty-year guideline sentence to reflect Sanchez' "minimal" role in the offense. Even accepting Sanchez' characterization of his role in the offense, the refusal to depart is not reviewable unless the district court mistakenly believed it lacked the authority to depart. United ______ States v. Amparo, 961 F.2d 288, 292 (1st Cir.), cert. denied, 113 ______ ______ _____ ______ S. Ct. 224 (1992); United States v. Lauzon, 938 F.2d 326, 330 ______________ ______ (1st Cir.), cert. denied, 112 S. Ct 450 (1991). As the district _____ ______ court was fully cognizant of its authority, we are without jurisdiction to consider Sanchez' guideline sentencing appeal. 16 C. Jorge's Appeal. C. Jorge's Appeal. ______________ Jorge Sostre claims that his convictions under Count 1 (conspiracy to distribute and to possess with intent to distrib- ute, 21 U.S.C. 846) and Count 2 (possession of cocaine with intent to distribute, id. 841(a)(1), (b)(1)(B); 18 U.S.C. 2) ___ were based solely on his "mere presence" in the vicinity of the drug transaction. Jorge contends that he was simply visiting brother Rodrigo's apartment, and that the casual statements he made to Vegas and Agent Roberto, though arguably indicating his general awareness of the drug transaction, were far too vague to establish his active participation. Jorge says the government's characterization of him as a "lookout" is unsupported by the evidence, which shows that the front door of the apartment building was left open during the drug transaction, and that he never made any attempt to signal or warn the others when the DEA raid began. As to his constructive possession of the cocaine, Jorge argues that there is no evidence he ever had access to it or power over it. We again view all evidence in the light most favorable to the government, Wight, 968 F.2d at 1395, while at the same _____ time recognizing that "'the line that separates mere presence [at the site of a drug offense] from culpable presence is a thin one, difficult to plot,'" United States v. O'Campo, 973 F.2d 1015, ______________ _______ 1020 (1st Cir. 1992) (quoting United States v. Ortiz, 966 F.2d _____________ _____ 707 (1st Cir. 1992)). In this case, however, we believe that the evidence, as a whole, adequately supported the conclusion that 17 Jorge knowingly remained on the front porch to facilitate the prearranged drug transaction. First, Jorge's presence during Rodrigo's incriminating conversations with Vegas and Agent Roberto, his apparent agree- ment with his brother's assessments concerning the quality of the cocaine and the low level of police activity in the neighborhood, and his later statements about the "money" and "merchandise," provided firm support for an inference that Jorge knew that an illegal drug transaction was about to occur. Second, "jurors are neither required to divorce them- selves from their common sense nor to abandon the dictates of mature experience," which reasonably may include their recogni- tion that "criminals rarely welcome innocent persons as witnesses to serious crimes." Cf. Ortiz, 966 F.2d at 712; United States v. ___ _____ _____________ Batista-Polanco, 927 F.2d 14, 18 (1st Cir. 1991). Jorge did not _______________ reside at the apartment where the drug transaction occurred, nor was he a captive of the circumstances. Although appellate counsel suggested the possibility that Jorge's visit to his brother's apartment may have been occasioned by the innocent impulse to promote their filial bond, the jury reasonably could conclude that an innocent person, with knowledge of an impending drug transaction, would not linger outside for over an hour on a winter day in a location which afforded him an obvious vantage point from which to observe the surrounding neighborhood as well as the ingress to the site of the drug deal. Cf. United States ___ ______________ v. Padilla, 961 F.2d 322, 325 (2d Cir.) (while "mere negative _______ 18 acquiescence," even coupled with "guilty knowledge," is generally insufficient to establish participation, the otherwise innocent behavior of "scanning the area" may support a reasonable infer- ence that defendant acted as "lookout"), cert. denied, 113 S. Ct. _____ ______ 138 (1992); see also United States v. Martinez, 479 F.2d 824, ___ ____ ______________ ________ 829 (1st Cir. 1973). ("[P]resence itself implies participation [where] . . . a companion stands by during a [crime], ready to sound a warning or give other aid if required."). Finally, the record indicates that Jorge, at the onset of the DEA raid, moved off the front porch and away from the residence "in a rapid manner," then "casually slow[ed] down and walk[ed] up the sidewalk." We have recognized that "[e]vidence of flight . . . is a particularly eloquent reflection of a guilty mind," United States v. Martinez, 922 F.2d 914, 923 (1st Cir. _____________ ________ 1991), which "'may be admitted at trial . . . so long as there is an adequate factual predicate creating an inference of guilt of _________________ the crime charged.'" United States v. Montoya, 917 F.2d 680, 683 _____________ _______ (1st Cir. 1990) (quoting United States v. Hernandez-Bermudez, 857 _____________ __________________ F.2d 50, 52 (1st Cir. 1983)) (emphasis added). While the evi- dence of flight would not have been enough in and of itself to support Jorge Sostre's convictions, the jury fairly could have found, beyond a reasonable doubt, that in so acting he was attempting to flee the crime scene, thereby recasting his earlier admissions and conduct as the factual predicate for the ultimate common-sense inference of guilt. Id. (significance of evidence ___ of flight is exclusively for the jury). 19 The judgments of conviction are affirmed. The judgments of conviction are affirmed. ________________________________________ 20