UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

 

No. 95-1441

UNITED STATES OF AMERICA,

Appellee,

v.

MIGUEL DIMARZO, a/k/a MICHAEL DIMARZO,

Defendant, Appellant.

 

No. 95-1442

UNITED STATES OF AMERICA,

Appellee,

v.

MARIO J. ALZATE-YEPEZ,

Defendant, Appellant.

 

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge] 

 

Before

Torruella, Chief Judge, 

Cyr and Lynch, Circuit Judges. 

 

David J. Wenc for appellant DiMarzo. 
Alan Black, with whom Morton & Black was on brief for appellant 
Alzate-Yepez.
Andrew Levchuk, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, was on brief for appellee. 

 

April 10, 1996
 

2

CYR, Circuit Judge. Appellants Mario Alzate-Yepez CYR, Circuit Judge. 

("Mario" or "Alzate") and Miguel DiMarzo were jointly tried and

convicted of possessing cocaine, with intent to distribute, see 

21 U.S.C. 841(a)(1) (1994), and conspiracy, see id. 846. 

Appellants assign error by the district court in allowing

certain trial testimony and denying their respective motions for

judgments of acquittal. Appellant Alzate additionally claims

that the district court erred in denying his pretrial motion for

severance and imposed too harsh a sentence. Finding no error,

we affirm. 

I I

BACKGROUND BACKGROUND 

In April 1994, the Western Massachusetts Narcotics

Task Force brokered a cocaine deal among appellants and one

Robert Schultz, an undercover Task Force agent. During the

first phase, Alonzo Alzate-Yepez ("Alonzo"), Mario's brother,

agreed that he would arrange to deliver five kilograms of

cocaine to Schultz at the Westfield Motor Inn on April 12, 1994,

in return for $100,000. If all went well on April 12, Alonzo

promised to deliver to Schultz another five kilograms a day or

two later, and ten kilograms per week thereafter. 

On April 12, at approximately 5:00 a.m., appellant

Mario and brother Alonzo set out in Mario's car on the 100-mile

trip from Boston to Westfield. Upon arrival at the Westfield

Motor Inn, Mario remained in the car while Alonzo registered at

the Inn. After waiting about fifteen minutes, Mario entered the

3

Inn and requested a separate room overlooking the parking lot.

Meanwhile, a Task Force surveillance team had taken up positions

around the Inn. Shortly thereafter, the agents saw a male,

later identified as Mario, lingering around the office and

parking lot of the Inn while carefully observing cars and people

in the area. 

Agent Schultz and another undercover agent arrived at

the restaurant parking lot next to the Inn around 9:30 a.m.

Alonzo approached them, introductions ensued, and the three went

into the restaurant for coffee. Alonzo told Schultz that he was

expecting a courier to arrive with the cocaine at any time.

Soon Schultz left the restaurant to "beep" the courier from his

car phone, while Alonzo returned to his room at the Inn to await

a call from the courier. While Agent Schultz was standing

beside his car, he noticed that Mario was observing him and the

surrounding area.

A short time later, Schultz went to Alonzo's room on

the ground floor, where Alonzo told him that the courier had

gotten lost, but now had correct directions to the Inn and

should arrive within ten minutes. Alonzo added that "they" had

eight cars, with secret compartments for carrying cocaine, but

he was not sure which was being used for this deal. At about

10:45 a.m., a white Oldsmobile entered the parking lot and

stopped just outside Alonzo's ground-floor room. Before leaving

to meet the driver as it turned out, appellant Miguel DiMarzo

Alonzo advised Schultz to stay put. 

4

After greeting one another, Alonzo and DiMarzo

conversed as DiMarzo scanned the area and the two walked to the

restaurant. Shortly after entering the restaurant, Alonzo left,

and invited Schultz to join him in the parking lot, where he

unlocked the driver's door of the Oldsmobile to let Schultz in

the passenger side. After fidgeting with the defroster, Alonzo

reached under the dashboard and popped open two interior side

panels in the rear seat area which contained several bricks of

cocaine wrapped in duct tape and plastic. After inspecting the

brick-like packages, Agent Schultz signalled the Task Force

surveillance team, and Alonzo, Mario and DiMarzo were arrested.

The cocaine recovered from the concealed compartments in the

Oldsmobile weighed 4.94 kilograms, almost exactly the five

kilograms Alonzo had agreed to supply. 

On May 17, 1994, a federal grand jury indicted the

Alzate brothers and DiMarzo under 21 U.S.C. 841(a)(1) and

846. Alonzo Alzate pled guilty to both counts, whereas appel-

lants Mario Alzate and Miguel DiMarzo were jointly tried and

convicted on both counts. In due course, the district court

imposed sentences on appellants and final judgment entered on

March 31, 1995. DiMarzo filed a notice of appeal on April 3.

Appellant Mario Alzate did not do so until April 13.1
 

1The government contends that we lack jurisdiction of the
latter appeal because Mario did not file a notice of appeal
within the ten-day period. See Fed. R. App. P. 4(b), 26(a); 
United States v. Morillo, 8 F.3d 864, 867 (1st Cir. 1993). 
However that may be, this is an appropriate case in which to
resolve the appeal on the merits. See United States v. Connell, 
6 F.3d 27, 29 n.3 (1st Cir. 1993) (foregoing resolution of

5

 

jurisdictional question where same party inevitably will prevail
on merits). 

6

II  II

DISCUSSION DISCUSSION 

A. The Severance Motion A. The Severance Motion 

Appellant Mario Alzate filed a pretrial motion for a

separate trial pursuant to Fed. R. Crim. P. 14, on the ground

that the "spillover" effect of the evidence against DiMarzo

would prejudice Mario unfairly. Appellants contended at trial

that they had not known that Alonzo Alzate planned to conduct a

drug deal at the Inn. Mario argues on appeal that DiMarzo's

"mere presence" defense was so patently "ridiculous" that the

jury likely concluded without separately considering the

evidence against Mario that both were guilty. His contention

fails.

Severance rulings under Fed. R. Crim. P. 14 are

reviewed only for manifest abuse of discretion. United States 

v. Flores-Rivera, 56 F.3d 319, 325 (1st Cir. 1995).  

As a rule, persons . . . indicted together
should be tried together[, which] helps . .
. prevent inconsistent verdicts and . . .
conserve resources (judicial and prosecuto-
rial). Thus, . . . a defendant who seeks a
separate trial can ordinarily succeed . . .
only by making a strong showing of evident
prejudice. . . . Supreme Court precedent
instructs that a district court should grant
a severance under Rule 14 only if there is a
serious risk that a joint trial would com-
promise a specific trial right of one of the
defendants, or prevent the jury from making
a reliable judgment about guilt or in-
nocence. 

Id. (internal citations and quotations omitted). Rarely is 

severance required in a conspiracy case. United States v. 

7

Brandon, 17 F.3d 409, 440 (1st Cir.), cert. denied, 115 S. Ct. 

80 (1994). Appellants were charged as coconspirators, and with

an identical substantive offense, all in the same indictment.

Careful review discloses no unfairness attributable to their

joint trial. More particularly, Mario makes no plausible

showing of prejudice, especially in light of the repeated 

instruction by the court that the jury must consider the evi-

dence against each defendant independently and return separate

verdicts. Id. The trial court acted well within its broad 

discretion in denying the motion to sever. 

B. The Schultz Testimony B. The Schultz Testimony 

On redirect examination Agent Schultz was allowed to 

testify that, in his experience, innocent observers are not

invited to accompany criminals engaged in completing a drug

deal. Appellant DiMarzo argues that (1) Fed. R. Crim. P.

16(a)(1)(E) obligated the government to provide him with pretri-

al discovery relating to Schultz' expert qualifications to

testify to this matter, (2) Schultz' opinion was inadmissible

under both Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 

U.S. 579 (1993), and Fed. R. Evid. 704(b) (prohibiting testimony

on ultimate jury issue). Similarly, Mario Alzate contends that

he was entitled to a mistrial, or at the very least a continu-

ance for further discovery relating to Schultz' expert qualifi-

cations.2 We do not agree. 
 

2We review these discovery and evidentiary rulings under an
"abuse of discretion" standard. United States v. Lanoue, 71 F.3d 
966, 973 (1st Cir. 1995) (discovery rulings); United States v. 

8

On cross-examination, both defense counsel repeatedly

invited Agent Schultz to draw upon his experience as a drug

enforcement officer. For example, Schultz was asked whether

drug crime participants typically carry weapons. On redirect,

the prosecutor asked Schultz: "[C]an you tell us how often in

your experience drug dealers bring along with them to a deal a

casual innocent observer?" Over defense objections, Schultz was

allowed to respond that he had never "seen a person just casual-

ly come along for a drug deal." 

We reject appellants' contentions that either Criminal

Rule 16(a)(1)(E) or Daubert was implicated by the challenged 

testimony. First, the Schultz response expressed neither a lay

nor an expert opinion, as distinguished from a statement of fact 

as to what Schultz had witnessed during his 29 years in law

enforcement. As the challenged testimony proffered no opinion, 

lay or expert, but simply the witness's personal experience

relating to a subject bearing directly upon the appropriateness

of a jury inference, see United States v. Batista-Polanco, 927 

F.2d 14, 18 (1st Cir. 1991) (extended presence at scene of

heroin packaging operation supports "common sense" inference of

guilt), long held permissible in such circumstances, see United 

States v. Smith, 680 F.2d 255, 260 (1st Cir. 1982), cert. 

denied, 459 U.S. 1110 (1983), we reject the claim.  

 

Neal, 36 F.3d 1190, 1205 (1st Cir. 1994) (continuance); United 
States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994) (mistrials), 
cert. denied, 115 S. Ct. 919 (1995); United States v. Cotto- 
Aponte, 30 F.3d 4, 6 (1st Cir. 1994) (evidentiary rulings).  

9

Nor did the Schultz testimony encroach upon the jury's

factfinding function regarding the ultimate issue of guilt. The

district court alertly gave an immediate jury instruction that

"mere presence" at a crime scene is insufficient to establish

guilt, and that ultimately it was for the jury to decide whether

the government had met its burden of proof. See United States 

v. Myers, 972 F.2d 1566, 1577 n.8 (11th Cir. 1992) (Bownes, J.), 

cert. denied, 507 U.S. 1017 (1993). When Agent Schultz later 

was subjected to further cross-examination, see United States v. 

Paiva, 892 F.2d 148, 157 (1st Cir. 1989), he conceded the 

possibility that a driver might not have known that he was

transporting someone to a crime scene. Thus, viewing the

challenged Schultz testimony in the context of the entire

examination, we find neither error nor unfair prejudice. 

C. Evidence of Prospective Sentence C. Evidence of Prospective Sentence 

In an effort to forfend against an argument by the

government that DiMarzo had known the cocaine was in the Oldsmo-

bile based on the improbability that criminal conspirators

would entrust such valuable contraband to an innocent third par-

ty DiMarzo sought to inform the jury of the harsh sentence he

would face upon conviction, to demonstrate the strong inducement

the "real" drug dealers had to select an unsuspecting dupe to

transport their drugs, so as to avoid detection themselves. On

appeal, DiMarzo contends that the rejection of his proffer

denied him the "only way" he had to counteract the adverse

inference suggested by the government. We think the district

10

court soundly excluded the evidence. See Cotto-Aponte, 30 F.3d 

at 6 (applying "abuse of discretion" standard to evidentiary

rulings). Accordingly, it was proper as well to reject the

requested instruction that the jury not draw the inference urged

by the government. 

The DiMarzo proffer would have necessitated an unwar-

ranted departure from the fundamental division of responsibili-

ties between judge and jury. See Shannon v. United States, 114 

S. Ct. 2419, 2424 (1994). As a general rule, under our criminal

justice system it is the jury's responsibility to determine

guilt or innocence on the basis of the facts it has found,

whereas the court is responsible, among other things, for

sentencing a defendant after a guilty verdict. As federal

juries perform no sentencing function, "providing jurors sen-

tencing information invites them to ponder matters that are not

within their province, distracts them from their factfinding

responsibilities, and creates a strong possibility of confu-

sion." Id. Thus, even assuming that DiMarzo's guideline 

sentencing range had some minimal probative value a dubious

proposition at best the district court did not err in reject-

ing the DiMarzo proffer given the considerations alluded to in

Shannon. See Fed. R. Evid. 403; cf. United States v. Luciano- 

Mosquera, 63 F.3d 1142, 1153 (1st Cir. 1995) (rejecting Sixth 

Amendment challenge to restriction upon cross-examination

relating to potential punishment). 

D. Sufficiency of the Evidence D. Sufficiency of the Evidence 

11

Appellants claim reversible error in the denial of

their respective motions for judgments of acquittal. See Fed. 

R. Crim. P. 29. Under Criminal Rule 29, we review the evidence

in the light most favorable to the government, drawing all

plausible inferences and resolving all credibility determina-

tions in line with the verdicts. United States v. Spinney, 65 

F.3d 231, 234 (1st Cir. 1995). We will uphold a verdict if a

rational factfinder could have found each essential element of

the offense beyond a reasonable doubt. United States v. Gomez- 

Pabon, 911 F.2d 847, 852 (1st Cir. 1990), cert. denied, 498 U.S. 

1074 (1991). 

The government met its test. Under 21 U.S.C. 

841(a)(1), it was required to establish that defendants knowing-

ly and intentionally possessed a controlled substance with

intent to distribute. United States v. Aguilar-Aranceta, 957 

F.2d 18, 23 (1st Cir.), cert. denied, 506 U.S. 834 (1992). 

Under 21 U.S.C. 846, the government was required to establish

that defendants agreed, at least tacitly, to commit the substan-

tive offense which constituted the object of their agreement,

and that defendants voluntarily participated in the conspiracy.

Flores-Rivera, 56 F.3d at 323-24. The jury was entitled to rely 

upon circumstantial evidence such as presence at the crime

scene and association with others involved in the crime to

infer essential elements of the crime, except that such evi-

dence, standing alone, is insufficient to support conviction. 

Id. at 324. Although appellants hold themselves out as excep- 

12

tions that prove the rule, there is ample record evidence, above

and beyond their mere presence and association, to permit a

rational jury to find guilt under both counts, beyond a reason-

able doubt.

Appellant Mario Alzate and his brother Alonzo drove

approximately 100 miles to the crime scene where Alonzo had made

prior arrangements for the cocaine to be delivered to undercover

Agent Schultz in return for $100,000. Together with the incrim-

inating circumstantial evidence, the familial relationship

between Alonzo (the "pointman") and Mario (the "lookout" and

driver) permitted a rational jury inference that Mario well knew

he was involved in a drug deal. See United States v. Morales- 

Cartagena, 987 F.2d 849, 851-52 (1st Cir. 1993). There was 

ample evidence to enable the jury to find that Mario served as

the "lookout" at the crime scene, see United States v. Hernan- 

dez, 995 F.2d 307, 314 (1st Cir.), cert. denied, 114 S. Ct. 407 

(1993), especially since the brothers registered in separate

rooms at the Inn and Mario requested a room overlooking the

parking lot from where he surveilled the crime scene before the

drugs arrived. In addition, Mario testified in his own defense,

either contradicting the testimony of government witnesses

(e.g., in contrast to the Inn manager, denying that he had

requested a room overlooking the parking lot) or offering

innocent explanations for other suspicious conduct (e.g., that

he had strolled around the Inn parking lot just to take in "the

countryside"), which the jury was entitled to reject and treat

13

as evidence of consciousness of guilt. See United States v. 

Hadfield, 918 F.2d 987, 999 (1st Cir. 1990), cert. denied, 500 

U.S. 936 (1991).3 

The sufficiency challenge mounted by DiMarzo is

without merit as well. The evidence demonstrated that Alonzo

had anticipated that the cocaine would arrive in a car equipped

with secret compartments, and that he knew how to contact the

driver en route. Agent Schultz testified that Alonzo spoke with

the driver of the vehicle carrying the cocaine the morning of

the drug deal, conceivably via the cellular phone in the white

Oldsmobile, and gave him the correct directions to the Inn. A

short time later, DiMarzo arrived at the Inn with the cocaine,

pulled up just outside the ground-floor room occupied by Alonzo,

and immediately met with him. DiMarzo was seen scanning the

parking lot as the two men walked to the restaurant. Alonzo

returned with the keys to the Oldsmobile and, in the presence of

Schultz, opened the concealed interior compartments containing

bricks of cocaine in the promised amount. 

As we repeatedly have recognized, a jury is free to

rely on its common sense, see, e.g., Hernandez, 995 F.2d at 314, 

and may infer that criminal conspirators normally do not involve

innocent persons at critical stages of a drug deal, see, e.g., 

United States v. Tejeda, 974 F.2d 210, 213 (1st Cir. 1992). 

Thus, the jury reasonably could infer that DiMarzo knew he was
 

3As there was no abuse of discretion, we likewise affirm the
denial of Mario's motion for new trial under Fed. R. Crim. P. 33.
United States v. Garcia, 978 F.2d 746, 748 (1st Cir. 1992).  

14

delivering the cocaine needed to consummate the prearranged deal

with Alonzo, rather than that Alonzo and appellant Mario Alzate

had entrusted to an unsuspecting nonparticipant the responsi-

bility for delivering $100,000 worth of cocaine to the scene of

the exchange. E. The Alzate Sentencing Claims E. The Alzate Sentencing Claims 

Mario Alzate claims that he was a "minimal partici-

pant," see U.S.S.G. 3B1.2(a) (1995), and that he should have 

been granted a downward departure based on "aberrant behavior,"

see id. 5K2.0. Neither contention helps him.  

First, the district court found that Mario was enti-

tled to a two-level downward adjustment under U.S.S.G. 3B1.2-

(b), as a "minor participant." On appeal, Mario argues that he

deserved a three or four-level adjustment, based on his "minimal

role." The record evidence noted above, however, warrants the

finding that Mario did not merit a "minimal role" adjustment.

See United States v. Munoz, 36 F.3d 1229, 1238 (1st Cir. 1994) 

(off-loading portion of single drug shipment or smuggling drugs

for small transaction may indicate minimal participation), cert. 

denied, 115 S. Ct. 1164 (1995). Thus, there was no clear error. 

United States v. Neal, 36 F.3d 1190, 1211 (1st Cir. 1994).  

Finally, the second assignment of error is squarely

foreclosed because the district court was well aware of its

authority to grant a downward departure and declined to do so.

We therefore lack jurisdiction to review the refusal to depart

unless based on a mistake of law. United States v. Grandmaison, 

No. 95-1674, 1996 WL 80411 (1st Cir. Mar. 1, 1996) (clarifying

15

"aberrant behavior" standard); United States v. Lewis, 40 F.3d 

1325, 1345 (1st Cir. 1994). There is no indication that the

district court misapprehended the confines of its legal authori-

ty. 

Affirmed.  Affirmed.  

16