UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Arnold L. HOLLINGSWORTH, Jr. and William A. Pickard, III, Defendants–Appellants, Cross–Appellees.

Nos. 92–2399, 92–2483, 92–2694 and 92–2695.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1993.

Decided Oct. 29, 1993.

Reargued En Banc Feb. 8, 1994.

Decided June 2, 1994.

Mark D. Stuaan, Asst. U.S. Atty. (argued), Indianapolis, IN, for plaintiff-appellee U.S.

James E. Evans, Jr. (argued), Evans & Evans, Springdale, AR, for defendant-appellant Arnold L. Hollingsworth, Jr.

Bradley L. Williams (argued), Ice, Miller, Donadio & Ryan, Indianapolis, IN, for defendant-appellant William A. Pickard, III.

Before POSNER, Chief Judge, and CUMMINGS, BAUER, CUDAHY, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION, KANNE, and ROVNER, Circuit Judges.

POSNER, Chief Judge.

The defendants, Pickard (a dentist) and Hollingsworth (a farmer), were convicted by a jury of money laundering and related offenses in violation of federal law, and were sentenced to 24 and 18 months in prison, respectively. A panel of this court held that the defendants had been entrapped as a matter of law, and were entitled to be acquitted. 9 F.3d 593 (7th Cir.1993). Rehearing en banc was granted on the petition of the government, which contended that the decision had created a new element of the defense of entrapment—"readiness"—and by doing so had radically altered the law of entrapment.

■ What is true is that until the Supreme Court's recent decision in *Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), the courts of appeals had been drifting toward the view, clearly articulated by the Second Circuit in *United States v. Ulloa,* 882 F.2d 41, 44 (2d Cir.1989), that the defense of entrapment must fail in any case in which the defendant is "willing," in the sense of being psychologically prepared, to commit the crime for which he is being prosecuted, even if it is plain that he would not have engaged in criminal activity unless inveigled or assisted by the government. This drift in thinking reflected the semantic pull of the term "predisposition," the central element of the defense of entrapment as articulated in the modern cases. The word is suggestive of pure willingness; and it is the suggestion picked up by *Ulloa* and other decisions. But the suggestion cannot in our view be squared with *Jacobson.* The defendant in that case was prosecuted for buying child pornography, and convicted. The pornography was furnished him by government agents, who were aware of his interest in preteen sex because he had bought magazines that catered to this interest but were not illegal. The purchase for which he was prosecuted was the culmination of a 26–month campaign by the government to interest Jacobson in buying magazines that, because they contained photographs of children engaged in sexual activity, violated the child pornography laws. It is unclear why the government took so long to spring the trap; for Jacobson at no time exhibited any reluctance to purchase such magazines; he may not even have known that they were illegal. Despite his lack of reluctance, emphasized by Justice O'Connor in her dissenting opinion, the Supreme Court reversed Jacobson's conviction, holding that he had been entrapped as a matter of law.

The vote was close (five to four), and the majority opinion, written by Justice White, does not purport to break new ground, to overrule decisions like *Ulloa,* or to qualify language in previous decisions by the Supreme Court which might have been read to equate predisposition to intent. E.g., *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). But it is not unusual for a court to change the law without emphasizing its departures from or reinterpretation of precedent; emphasis on continuity is characteristic of common law lawmaking even when innovative, and the doctrine of entrapment is a common law doctrine. Cases both in this and in other circuits, besides the panel decision in this case, recognize that *Jacobson* has changed the landscape of the entrapment defense. E.g., *United States v. Groll,* 992 F.2d 755, 760 (7th Cir.1993); *United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir.1992); *United States v. Mkhsian,* 5 F.3d 1306, 1310–11 (9th Cir. 1993). In *Olson,* a panel of this court, speaking through Judge Coffey, referred to "the new standard enunciated in *Jacobson,*" 978 F.2d at 1483, and in *Groll* another panel said that *Jacobson* had "breath[ed] new life into the entrapment defense." 992 F.2d at 760. *United States v. Beal,* 961 F.2d 1512 (10th Cir.1992), upheld a judgment of acquittal, in a case factually much like the present one, on the basis of *Jacobson.* Cf. *United States v. Skarie,* 971 F.2d 317, 321 (9th Cir.1992). The facts of *Jacobson* were unquestionably peculiar, and the government's tactics—which included "waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials," ——

U.S. at ——, 112 S.Ct. at 1542—bizarre and distasteful. Nevertheless, had the Court in *Jacobson* believed that the legal concept of predisposition is exhausted in the demonstrated willingness of the defendant to commit the crime without threats or promises by the government, then Jacobson was predisposed, in which event the Court's reversal of his conviction would be difficult to explain. The government did not offer Jacobson any inducements to buy pornographic magazines or threaten him with harm if he failed to buy them. It was not as if the government had had to badger Jacobson for 26 months in order to overcome his resistance to committing a crime. He *never* resisted.

The vote in *Jacobson*, as we have noted, was close. If our dissenting colleagues had been members of the Supreme Court when the case was decided, it would no doubt have been decided differently. The decision is narrowly written, with emphasis on the particular tactics employed by the government, and should be cautiously construed. But we are naturally reluctant to suppose that the decision is limited to the precise facts before the Court, or to ignore the Court's definition of entrapment, which concludes the analysis portion of the opinion and is not found in previous opinions, as "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Id.* at ——, 112 S.Ct. at 1543. That was Jacobson. However impure his thoughts, he was law abiding. A farmer in Nebraska, his access to child pornography was limited. As far as the government was aware, over the period of more than two years in which it was playing cat and mouse with him he did not receive any other solicitations to buy pornography. *Id.* at ——, 112 S.Ct. at 1539. So, had he been "left to his own devices," in all likelihood he would "have never run afoul of the law." If the same can be said of Pickard and Hollingsworth, they too are entitled to be acquitted. Their willingness to commit the crimes to which the government invited them cannot be decisive. Predisposition requires more; otherwise not only the outcome of *Jacobson* but also the definitional passage that we quoted and that conspicuously omits mention of any mental state are difficult to make sense of.

Recently the First Circuit, struggling as are we to understand the scope of *Jacobson*, suggested that all it stands for is that the government may not, in trying to induce the target of a sting to commit a crime, confront him with circumstances that are different from the ordinary or typical circumstances of a private inducement. *United States v. Gendron*, 18 F.3d 955, 962 (1st Cir.1994). The court in *Gendron* thought that the government's attempt to persuade Jacobson that he had a First Amendment right to consume child pornography had departed from typicality. We are not so sure. Just as the gun industry likes to wrap itself in the mantle of the Second Amendment, so the pornography industry likes to wrap itself in the mantle of the First Amendment. But however that may be, the government made no effort in *this* case to show that a real customer for money laundering would have responded to an advertisement to sell a Grenadan bank, which is what happened here as we are about to see.

We put the following hypothetical case to the government's lawyer at the reargument. Suppose the government went to someone and asked him whether he would like to make money as a counterfeiter, and the reply was, "Sure, but I don't know anything about counterfeiting." Suppose the government then bought him a printer, paper, and ink, showed him how to make the counterfeit money, hired a staff for him, and got everything set up so that all he had to do was press a button to print the money; and then offered him $10,000 for some quantity of counterfeit bills. The government's lawyer acknowledged that the counterfeiter would have a strong case that he had been entrapped, even though he was perfectly willing to commit the crime once the government planted the suggestion and showed him how and the government neither threatened him nor offered him an overwhelming inducement.

■ We do not suggest that *Jacobson* adds a new element to the entrapment defense—"readiness" or "ability" or "dangerousness" on top of inducement and, most important, predisposition. (As explained in

the panel opinion, inducement is significant chiefly as evidence bearing on predisposition: the greater the inducement, the weaker the inference that in yielding to it the defendant demonstrated that he was predisposed to commit the crime in question. 9 F.3d at 597.) Rather, the Court clarified the meaning of predisposition. Predisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force. The dictionary definitions of the word include "tendency" as well as "inclination." The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation. A public official is in a position to take bribes; a drug addict to deal drugs; a gun dealer to engage in illegal gun sales. For these and other traditional targets of stings all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements; ability can be presumed. It is different when the defendant is not in a position without the government's help to become involved in illegal activity. The government "may not provoke or create a crime, and then punish the criminal, its creature." *Casey v. United States,* 276 U.S. 413, 423, 48 S.Ct. 373, 376, 72 L.Ed. 632 (1928) (Brandeis, J., dissenting). Such cases, illustrated by *Jacobson* and by our counterfeiter hypothetical, are rare; we must decide whether this case is one of them.

Pickard is an orthodontist practicing in Fayetteville, Arkansas. Hollingsworth is a farmer and businessman, also in Arkansas. Although Pickard's dental practice was (and as far as we know still is) successful, he continually tried to augment his income by business ventures, all of which failed. The last and most disastrous failure began in 1988 when he and Hollingsworth decided to become international financiers—a vocation for which neither had any training, contacts, aptitude, or experience. Pickard formed a Virgin Islands corporation, CIAL (Compagnie d'Investement de Les Antilles Limitee),

to conduct international banking. The corporation was financed by capital contributions totaling $400,000. Almost all the money came from Pickard and his family, but Hollingsworth and a Taiwanese investor made small contributions. With this money, the corporation advertised for customers and obtained two foreign banking licenses, one Grenadan. No customers were obtained through advertising or otherwise, and with the enterprise steadily losing money the corporation decided to sell the Grenadan license to raise additional working capital. Pickard placed a classified ad in the May 4, 1990, issue of *USA Today* offering to sell the unused license for $29,950. The ad listed CIAL's phone number and told callers to ask for "Bill."

U.S. customs agent J. Thomas Rothrock, working out of the Indianapolis office of the customs service, was that very day attending a seminar on money laundering. Rothrock read *USA Today* and his eye lit on Pickard's ad. Knowing that foreign banks are sometimes used for money laundering, Rothrock "assumed that someone who wanted to sell one would possibly be interested in money laundering." This was an odd assumption: if a foreign banking license is a useful thing to *use* for money laundering, why would someone interested in money laundering want to sell it? In any event, there is no evidence that Pickard's intention in offering his Grenadan banking license for sale was to get into the money-laundering business.

On May 11 Rothrock called the phone number listed in the ad. He left a message for "Bill," but no one returned the call. He called again on the seventeenth and this time Pickard returned his call. Using the pseudonym of "Tom Hinch," Rothrock told Pickard that he had money from an organization and wanted to deposit it offshore. Pickard responded that he had a bank for sale, and other vehicles or instruments for achieving "Hinch's" purposes that might be less expensive than a bank; and in a later call he described a variety of international financial services, all lawful. Hinch explained that his organization had a lot of cash, that the profit margin generated by the organization's activities was very large, and that the organization wanted to accumulate cash and deposit it

somewhere. Pickard pointed out that a cash deposit of less than $10,000 would not have to be reported to federal banking authorities and hence that a larger sum could be broken up into smaller ones and deposited in different banks; alternatively the whole sum could be deposited outside the United States. Rothrock expressed interest in the first maneuver. After this conversation, which occurred on May 18, Rothrock opened a formal investigation "to determine the past and present unlawful activities of William Pickard" and his corporation. There were no such activities; and in a subsequent conversation with Rothrock, Pickard retracted the suggestion that the money might be deposited outside the United States, remarking that that would violate the law. It bears emphasizing that there is no evidence that Pickard realized that "structuring" a large cash deposit to avoid federal reporting requirements would also violate the law. Since the panel decision, the Supreme Court has held that "structuring" is a specific-intent crime—unless the "structurer" knows that what he is doing is illegal, he is not guilty. *Ratzlaf v. United States,* — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). The line between evading and avoiding regulatory requirements is a fine one, and one who crosses it unknowingly is not a criminal.

Pickard asked "Hinch" for assurance that the cash wasn't from drug sales and that Hinch himself was not a federal agent or informer, and Hinch gave him the requested assurances. In another telephone conversation, this one at the end of May, Pickard asked Hinch whether he wanted Pickard merely to "clean and polish" funds or for "extended services"; Hinch was evasive. In subsequent conversations Pickard turned coy, indicating that he was interested only in a long-term banking relationship.

■ Matters were at a standstill between August 20, 1990, the date of the last of the conversations in which Pickard expressed his lack of interest in providing spot services, and February 9, 1991, when Rothrock, having obtained $200,000 in sting money from his superiors, called Pickard, told him he was "getting overwhelmed and I'm gonna be in need of your services," and arranged to meet

Pickard in St. Louis ten days later. In this, their first face to face meeting, "Hinch" explained that the source of his cash was the smuggling of guns to South Africa. They agreed that Pickard would travel to a hotel room in Indianapolis where he would be shown $20,000 plus Pickard's fee of $2,405 in cash. Pickard would arrange a wire transfer of $20,000 to Hinch's bank account and after the transfer was confirmed would take possession of the cash. The transaction took place on April 3, 1991, and subsequent transactions brought the total transferred in this manner to $200,000. Hollingsworth made one of the trips to Indianapolis, bringing back $30,000 in cash for Pickard in exchange for $405 in fee and expenses—all that Hollingsworth ever realized from the dealings with Hinch, so far as the record discloses. A further transaction was scheduled for September 13, at which Pickard was to transfer $235,000 for Hinch, but when Pickard showed up he was arrested. Hollingsworth was arrested at the same time back in Arkansas. When arrested Pickard was carrying false-name passports for himself and Hollingsworth issued by the mythical "Dominion of Melchizedek." So far as appears, before becoming involved with Hinch neither Pickard nor Hollingsworth had ever engaged in financial or for that matter any other wrongdoing, the Melchizedekian passports having been obtained *after* Hinch appeared on the scene; and we know from *Jacobson* that a criminal predisposition induced by government action cannot be used to defeat an entrapment defense. *Jacobson v. United States, supra,* — U.S. at — and n. 2, 112 S.Ct. at 1541 and n. 2; *United States v. Hart,* 963 F.2d 1278, 1283 and n. 1 (9th Cir.1992). Nor did CIAL ever attract a single customer other than Hinch—who also was the only person who responded to the ad for the Grenadan banking license.

■ When Rothrock called Pickard on February 9, after a silence of five and a half months, Pickard's international-finance business was on the verge of closing; he had no customers. Had the government left Pickard "to his own devices"—had Rothrock left him alone after their inconclusive initial conversations—in all likelihood Pickard, a mid-

dle-aged man who so far as anyone knows had never before committed any crime, would never have committed a money-laundering or related offense. "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958). Rothrock and his superiors manufactured Pickard's and Hollingsworth's crimes. They turned two harmless, though weak, foolish, and in Pickard's case at least, greedy, men into felons.

There is no evidence that before "Hinch" began his campaign to inveigle them into a money-laundering scheme either Pickard or Hollingsworth had contemplated engaging in such behavior. Compare *United States v. Hudacek,* 7 F.3d 203, 205 (11th Cir.1993). No significance can be attached to their obtaining foreign banking licenses; they could not have obtained American licenses—they hadn't the background, resources, or connections. When the opportunity to become *crooked* international financiers beckoned, they were willing enough, though less willing than Jacobson had been to violate the federal law against purchasing child pornography through the mails—Jacobson never evinced reluctance, even though he had received no financial inducements. Pickard and Hollingsworth had no prayer of becoming money launderers without the government's aid. Their solicitations for financial business had produced a tiny investor, but no customers. Their corporation was running out of money when they placed the ad in *USA Today* for the Grenadan banking license. No one responded to the ad, except "Hinch." Suppose he hadn't responded. What would Pickard and Hollingsworth have done next? Whatever it takes to become an international money launderer, they did not have it. Had Hinch not answered the ad, Pickard would soon have folded his financial venture. It would have joined his other failures—his movie theaters that failed, his amusement park that failed, his apartment building that failed, his attempt to market cookbooks written by his wife that failed. By the time he turned with quixotic persistence to international banking he had already lost almost $300,000 in his business ventures. He plunged his remaining life savings and those of his family into CIAL. They were rapidly hemorrhaging when Hinch popped up. Had it not been for that contrived ray of hope Pickard would have been forced to abandon international financing in order to avoid financial ruin. He was a threat to himself and his family. He was never a threat to society. All this is even clearer with respect to Hollingsworth, who functioned in CIAL purely as a minor investor and factotum.

It would be different if CIAL had had an up-and-running bank, for then it would have had a realistic opportunity to engage in money laundering, in much the same way that a public official to whom a government undercover agent or informant might offer a bribe would have a real opportunity to sell his office, as in *United States v. Jenrette,* 744 F.2d 817, 822 (D.C.Cir.1984). Pickard and Hollingsworth didn't have a bank or a public office or any other facility that made it even remotely likely that they would have engaged in criminal activity if the government had not set their minds to it.

The point is not that Pickard and Hollingsworth were *incapable* of engaging in the act of money laundering. Obviously they were capable of the act. All that was involved in the act was wiring money to a bank account designated by the government agent. Anyone can wire money. But to get into the international money-laundering business you need underworld contacts, financial acumen or assets, access to foreign banks or bankers, or other assets. Pickard and Hollingsworth had none. (Notice that no use was made of the Grenadan banking license.) Even if they had wanted to go into money laundering before they met Hinch—and there is no evidence that they did—the likelihood that they could have done so was remote. They were objectively harmless.

■ We do not wish to be understood as holding that lack of *present* means to commit a crime is alone enough to establish entrapment if the government supplies the means. Only in punishing speech is the government limited to preventing clear and present dangers. Suppose that before Hinch chanced on

the scene (for *Jacobson* makes clear, as we have noted, that a predisposition *created* by the government cannot be used to defeat a defense of entrapment), Pickard had decided to smuggle arms to Cuba but didn't know where to buy a suitable boat. On a hunch, a government agent sidles up to Pickard and gives him the address of a boat dealer; and Pickard is arrested after taking possession of the boat and setting sail, and is charged with attempted smuggling. That would be a case in which the defendant had the idea for the crime all worked out and lacked merely the present means to commit it, and if the government had not supplied them someone else very well might have. It would be a case in which the government had merely furnished the opportunity to commit the crime to someone already predisposed to commit it. *Jacobson v. United States, supra,* —— U.S. at ——, 112 S.Ct. at 1541; *United States v. Kussmaul,* 987 F.2d 345, 349–50 (6th Cir. 1993). *Kussmaul,* a post-*Jacobson* child-pornography sting case, notes that the defendant "professed a familiarity with the film business and claimed frequently to order adult films through the mails." *Id.* at 350. A person who is likely to commit a particular type of crime without being induced to do so by government agents, although he would not have committed it when he did but for that inducement, is a menace to society and a proper target of law enforcement. The likelihood that he has committed this type of crime in the past or will do so in the future is great, and by arranging for him to commit it now, in circumstances that enable the government to apprehend and convict him, the government punishes or prevents real criminal activity. The government's inducement affects the timing of the offense; it does not create the offense by exploiting the susceptibility of a weak-minded person. The defense of entrapment reflects the view that the proper use of the criminal law in a society such as ours is to prevent harmful conduct for the protection of the law abiding, rather than to purify thoughts and perfect character.

Our two would-be international financiers were at the end of their tether, making it highly unlikely that if Hinch had not providentially appeared someone else would have guided them into money laundering. No real criminal would do business with such tyros. Or so it appears; perhaps the government could have shown that a Grenadan banking license has no other use but money laundering and that sooner or later Pickard and Hollingsworth would have gotten into money laundering even without the government's aid. No attempt was made to show this; and we remind that the government's acknowledged burden is to prove beyond a reasonable doubt that a defendant who raises a colorable defense of entrapment, as Pickard plainly did, has not in fact been entrapped. *Jacobson v. United States, supra,* —— U.S. at ——, 112 S.Ct. at 1540.

We have spoken mainly so far of Pickard. Hollingsworth, without quite saying that he himself was entrapped, argues that it would be "fundamentally unfair" to convict him if Pickard's defense of entrapment succeeds. The government's brief construes this as an argument for entrapment and responds that Hollingsworth was entrapped not by Rothrock but by Pickard and that private entrapment doesn't count. If Hollingsworth waived entrapment by putting all his eggs in the "fundamental fairness" basket—and maybe he did waive it, *United States v. Bradley,* 820 F.2d 3, 7 n. 5 (1st Cir.1987)—the government bailed him out by waiving waiver. *United States v. Caputo,* 978 F.2d 972, 975 (7th Cir.1992). So we proceed to the merits.

■ There is no defense of private entrapment. *United States v. Jones,* 950 F.2d 1309, 1315, (7th Cir.1991); *United States v. Manzella,* 791 F.2d 1263, 1269 (7th Cir.1986); *United States v. Emmert,* 9 F.3d 699, 703 (8th Cir.1993). A person hired to commit a crime cannot defend on the ground that the hirer offered him so much money that it broke down his resistance. Such a plea is actually an argument for a heavier sentence, in order to offset the inducement. The severe punishments that Congress has imposed for violation of the federal drug laws may reflect the profitability of drug trafficking: the more profitable a crime, the more costly must the punishment be to the criminal in order to deter him from committing it.

■ But Pickard did not induce Hollingsworth to commit a real crime. He transmitted Rothrock's inducement to commit a phony crime. Relative to Hollingsworth he was Rothrock's agent, albeit an unwitting one. At reargument the government's lawyer acknowledged that if Rothrock had suggested that Pickard associate another person with him in his scheme of money laundering, the government might be liable for vicarious inducement. One case so holds, *United States v. Klosterman*, 248 F.2d 191, 196 (3d Cir. 1957), and a number of others, illustrated by *United States v. Hernandez*, 995 F.2d 307, 313 (1st Cir.1993); *United States v. Neal*, 990 F.2d 355, 358 (8th Cir.1993); *United States v. Hodges*, 936 F.2d 371, 372 (8th Cir.1991), and *United States v. Bradley*, 820 F.2d 3, 8 (1st Cir.1987), so suggest. The result follows directly from the unquestioned principle that the defense of entrapment is available even when the government agent who does the entrapping is an informant rather than a government employee. *Sherman v. United States, supra*, 356 U.S. at 373–74, 78 S.Ct. at 821–22. Rothrock did not suggest, but he did induce, the association of Hollingsworth with Pickard in the scheme that Rothrock had hatched; and that we think is enough to make Pickard Rothrock's agent in entrapping Hollingsworth. To acquit Pickard but convict Hollingsworth would produce the absurdity of acquitting the principal while sending the agent to prison for 18 months even though the principal had rendered no assistance to the government, the agent did not have a longer criminal record (no evidence was presented at trial that either defendant had had any previous scrapes with the law), and no other circumstance authorizing heavier punishment of the lesser criminal was present either. There is nothing unlawful about acquitting the principal and convicting the agent, *Standefer v. United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), but we are entitled to doubt a view of doctrine that would make this result inevitable.

■ It is true that in *Manzella* a panel of this court left open the question whether there is a doctrine of vicarious entrapment. 791 F.2d at 1269–70. When *Manzella* came down, the Second Circuit had held that there

was such a doctrine. *United States v. Valencia*, 645 F.2d 1158, 1168–69 (2d Cir.1980). Since then, the First Circuit has held that there isn't, *United States v. Bradley, supra*, 820 F.2d at 8, and the Second Circuit has retrenched, *United States v. Pilarinos*, 864 F.2d 253, 256 (2d Cir.1988)—yet with the important qualification that if " 'the government's inducement was directly communicated to the ... [defendant]' by an unwitting middleman," the defendant would be entitled to submit his entrapment defense to the jury. *Id.* The court called this "derivative entrapment." Perhaps the most accurate statement of the current law is that while there is no defense of either private entrapment or vicarious entrapment, there is a defense of derivative entrapment: when a private individual, himself entrapped, acts as agent or conduit for governmental efforts at entrapment, the government as principal is bound. This principle follows as we said from the unquestioned principle that the entrapment defense will lie whether the government uses its own employee as the stinger or an informant.

The concern with recognizing a defense of vicarious entrapment is that it might enormously complicate the trial of criminal cases. We share that concern, and hence do not endorse the doctrine. *United States v. Marren*, 890 F.2d 924, 931 n. 2 (7th Cir.1989). In any case in which a government undercover agent or informant had been used, defendants with whom he had not dealt face to face or even over the phone could argue with more or less plausibility that the real criminals with whom they had dealt had merely been transmitting the inducements furnished by the agent or informant. Our case is different. Just as Pickard was entrapped by Agent Rothrock, so was Hollingsworth, even if on some occasions Rothrock was as it were speaking to Hollingsworth through Pickard rather than speaking to Hollingsworth directly. We add that if the first person whom the government entraps expands, embroiders, or elaborates the scheme proposed to him by the government, the accomplices with whom he associates himself in the larger scheme cannot shelter under his entrapment defense; nor, we believe, could he; nor could

they if, independently of any embroidery by the first "entrapee," they had been predisposed to join in the scheme, as in *Carbajal–Portillo v. United States*, 396 F.2d 944, 947 (9th Cir.1968).

The appeals and cross-appeals raise other issues, but on the view we take of the case they are moot. The judgment is reversed with directions to acquit the defendants.

REVERSED.

COFFEY, Circuit Judge, with whom EASTERBROOK, Circuit Judge, joins, dissenting.

I join the dissents of Judges Easterbrook and Ripple but write separately to emphasize what I believe is the majority's misinterpretation of *Jacobson v. United States*, — U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), and the majority's favorable interpretation (to the defendant) of the factual record.

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886–87, 99 L.Ed.2d 54 (1988). "Predisposition, 'the principal element in the defense of entrapment,' . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime. . . ." *Id.* (citations omitted).[1]

" 'It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises.' " *Jacobson*, — U.S. at ——,

112 S.Ct. at 1540 (quoting *Sorrells v. United States*, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932)); *United States v. Casanova*, 970 F.2d 371, 375–77 (7th Cir.1992) (merely providing an opportunity to commit a crime is not enough to establish entrapment) (citing *Jacobson* ). "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.* (quoting *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212–13).

"The question of entrapment is generally one for the jury, rather than for the court." *Mathews*, 485 U.S. at 63, 108 S.Ct. at 886; *see also United States v. Cervante*, 958 F.2d 175, 178 (7th Cir.1992) ("[w]hether [defendant] was entrapped is a question of fact for the jury") (emphasis added). *The majority has cast aside the ruling case law enunciating that "we must view the evidence in the light most favorable to the government and must affirm the conviction if we find that a rational trier of fact could have found the requisite predisposition beyond a reasonable doubt."* *United States v. Blackman*, 950 F.2d 420, 423 (7th Cir.1991) (emphasis added).

The majority argues that entrapment is "the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law." *Ante* at 1199 (quoting *Jacobson*, — U.S. at ——, 112 S.Ct. at 1543). The majority goes on to conclude that this quoted language "clarified the meaning of predisposition. Predisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force. The dictionary defini-

---

**1.** Our circuit examines five criteria to determine predisposition:

> "(1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was made by the government; (3) whether the defendant was engaged in criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense; overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government."

*United States v. Cervante*, 958 F.2d 175, 179 (7th Cir.1992) (quoting *United States v. Blackman*, 950 F.2d 420, 423 (7th Cir.1991)). In *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir.1983), this court stated " 'The most important factor . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement.' " *Id.* (quoting *United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978)).

tions of the word include 'tendency' as well as 'inclination.' The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so...." The majority claims the defendant must be "in a position without the government's help to become involved in illegal activity." And then the majority distinguishes the public official who is in the position to take bribes, the drug addict who is in the position to deal drugs and the gun dealer who is in the position to engage in illegal arms sales from the instant defendants who are not in the position to commit a criminal offense absent the "government's help." [2]

The majority stakes its decision on the fact that the defendants were not in the position to commit the crime without the government's help. The record fails to support the majority's contention, thus I am forced to disagree.

In the case before us, the majority reads the statement at the end of *Jacobson,* ("[w]hen the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene"), much too broadly. The Supreme Court in *Jacobson* declared "[h]ad the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." *Id.* at ——, 112 S.Ct. at 1541 (citing *Mathews v. United States,* 485 U.S. 58, 66, 108 S.Ct. 883, 888, 99 L.Ed.2d 54 (1988)). Thus, the Supreme Court viewed Jacobson as an "otherwise law-abiding citizen" who was entrapped because he was "the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations" that excited his interests in illegal and sexually explicit materials, *id.* at ——, 112 S.Ct. at 1541. The Supreme Court says nothing in *Jacobson* about the defendant not being in the *position* to commit the criminal act.[3] *Jacobson* is significant not because it limits the potential targets of government sting operations to *non*law-abiding citizens, but because it limits the measures which the government may take in attempting to induce an otherwise law-abiding citizen to violate the law, i.e., twenty-six months of persuasion is too much. *See Jacobson,* —— U.S. at ——, 112 S.Ct. at 1543 ("[t]he evidence that petitioner was ready and willing to commit the offense came only after the Government had devoted 2½ years to convincing him that he had or should have the right to engage in the very behavior proscribed by law"). The question before us, then, is whether the government's contact with Pickard and Hollingsworth, which the majority holds caused them to run afoul of the law, was comparable to the twenty six months of contacts with Jacobson. As the facts make clear, the present case and *Jacobson* bear little, if any, resemblance.

The majority creates a fictional image and hypothesizes about two allegedly "innocent," would-be international financiers, yet the testimony offered at trial, viewed in the light most favorable to the government as we must, *Blackman,* 950 F.2d at 423, portrays the defendants in a much less complimentary light. The U.S. Customs Agent, John Thomas Rothrock, initially became interested in the defendants when he noticed an ad in the *U.S.A. Today* offering an "international class A banking license" for sale. Rothrock called the number listed in the ad and left his undercover name "Tom Hinch" and his

---

**2.** The majority cites *United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993), for support of its theory that *Jacobson* changed the face of entrapment law. *Olson* merely states that *Jacobson* enunciates a new standard but contains no support for the sweeping change the majority proposes today, i.e., that the government must prove not only the defen-

dant's predisposition to commit the crime but also that he was in a "position" to commit the crime. *See infra* at 1206.

**3.** The requirement that the government prove the defendant was in a position to commit the crime is a new element of entrapment, created by the majority this date, and is discussed thoroughly in Judge Ripple's dissent.

phone number.[4] When the call was not returned, Rothrock called and left a second message. Pickard returned Rothrock's second call and at trial testified as follows concerning their first substantive discussion:

> [Prosecutor] "Isn't it also true, Dr. Pickard, that the very first substantive phone discussion you and the agent ever had was May 18, 1990?"

> [Pickard] "Well—I remember very little of the substance of the first, which were—I agree it was the second conversation we ever had; yes, sir."

> [Prosecutor] "Isn't it also true, Dr. Pickard, that was the first time that buying cashier's checks and money orders with the cash was ever discussed between you, the two of you?"

> [Pickard] "Yes, sir, I would say that's accurate."

> [Prosecutor] "You would also agree, would you not, Dr. Pickard, you were the one who brought up the subject?"

> [Pickard] "Yes, sir."

Significantly, by Pickard's own admission at trial, it was Pickard, whom the majority makes out to be a law-abiding "tyro,"[5] not Hinch who proposed the unlawful structuring transaction. *See supra.* Three days later, Pickard called "Hinch" *again* to discuss their possible business relationship and informed Hinch he (Pickard) had a "tap light" to monitor whether "anyone was tapping into the phones or listening in on [the] conversation." Twelve days later Pickard, the novice, called "Hinch" a third time and further expressed his ability to *"clean and polish"* Hinch's cash, i.e., *"tak[e] the money from [Hinch] and remov[e] any ownership or any source of the funds and put[ ] [it] into the banking system * * * to conceal the source of where the funds were coming from."* Also during the May 30, 1990 telephone call, Pickard and Hinch discussed a possible rendezvous because Hinch didn't want to discuss his business over the phone. On June 19th, defendant Hollingsworth called Hinch to solidify their plans for the rendezvous. Critical to the analysis of the defendants' predisposition is that after Hinch's first contact, it was the

---

**4.** Hinch initiated the investigation because Pickard was offering for sale an international Class A banking license which Hinch was well aware of being a valuable tool in money laundering. The analysis here should proceed much like that in a *Terry* stop because in a *Terry* stop, and in a government "sting," the officers usually begin with limited knowledge and proceed with the investigation based on the progressive revelation of facts. In a typical *Terry* stop, the officer must have a reasonable suspicion to make the stop based on specific articulable facts. Upon initial contact, when the officer begins questioning the suspect, if the officer's suspicions are not allayed, the stop may continue, i.e., further questions, background check, and a search for weapons until either the officer has probable cause for an arrest or he lacks sufficient cause and terminates the encounter.

A police officer or government agent may, because of his training, knowledge and experience, be able to discern more from a given situation than an average citizen. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (in which the Supreme Court upheld the defendant's conviction for possession of a concealed weapon which was seized after a police officer with 39 years experience observed the defendant repeatedly walking in front of a store and peering in the window). In this case, Agent Rothrock's suspicion was raised because Pickard placed an ad in a widely read daily newspaper offering a banking license for sale. To the average reader of the *USA Today,* an ad of this nature would be quite unremarkable, yet Agent Rothrock knew that a "Class A" international banking license was a valuable tool to someone interested in money laundering. While certainly not sufficient to establish probable cause or even reasonable suspicion, the newspaper ad certainly merited an investigatory phone call. Upon initial contact, Rothrock, through his undercover alias "Tom Hinch" informed Pickard that his organization had a lot of cash that needed to be deposited. Pickard, displayed his knowledge of money laundering by quickly devising two unlawful schemes to take care of Hinch's cash: depositing the money outside the United States or breaking up the large sums of cash into smaller amounts ("structuring" or "laundering"). Thus, in the first significant contact between the government agent and the suspect, the suspect proposed an unlawful transaction to the agent. The defendant's action was sufficient to warrant further investigation by Rothrock.

While the majority correctly states, "there is no evidence that Pickard's intention in offering his Grenadan banking license for sale was to get into the money-laundering business," for someone interested in making money (legally or illegally) through international finance, it is quite telling that he chose to advertise in a newspaper with one of the largest daily circulations in the country.

**5.** Novice.

defendants who initiated four separate phone calls and aggressively pursued the relationship with Hinch who they had every reason to suspect was not engaged in lawful activity.

In addition to these phone calls from the defendants to Agent Rothrock, Pickard also sent two letters to Rothrock, on May 23rd (describing defendants' business, International Consultants) and June 20th (providing a new business address). Importantly, it was the defendants who initiated these contacts with a "client" whose only proposition was that he had cash he wanted to be deposited offshore. Certainly the defendants were not men whom I would classify as "law-abiding citizens," if they were, why were they pursuing and cultivating a client whom they knew was interested in circumventing the law through illicit money laundering? The defendants are "presumed to know the law," *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1541, i.e., that this type of transaction was illegal.

The initial face-to-face meeting was delayed for several logistical reasons, and then from August 20th when Pickard called Hinch, until February 7, 1991, when Hinch called Pickard, there was no contact except for two form letters sent by Pickard mentioning that he still had a banking license for sale and was offering a book for sale on how one could own an international company. Hinch made no attempt to contact Pickard from July 3, 1990 to February 1991 while he was awaiting authorization for and receipt of "sting money" from his supervisors.

On February 7th, when Hinch finally called Pickard and said he was in need of Pickard's services, Pickard, the neophyte criminal, instructed him that he would first have to employ a private investigator to do a background check on Hinch. Once again, it is most obvious that Pickard knew full well that the transaction he was entering was unlawful and he was taking all precautions to avoid apprehension, but obviously he was not concerned with avoiding an illegal transaction.

On February 19th defendant Pickard and Hinch finally met in person in St. Louis, Missouri. Hinch, for the first time, mentioned the word "launder" in reference to what he desired from Pickard. Pickard assured Hinch he could arrange to convert Hinch's cash and get it into the banking system *while avoiding any reporting requirements.* But Pickard, realizing he was engaging in an illegal enterprise, was still very cautious. He inquired of Hinch as to whether he was *"wired"* and physically *"patted"* him down to see if he was wired with a recording device.[6] At this time, Hinch assured Pickard that the money was not from drug sales or gambling but rather that his cash was from smuggling guns into South Africa. Pickard was unabashed and made no attempt to terminate the relationship. When Hinch said that he had wished he never got his "hands dirty," i.e., involved in gun smuggling, Pickard, attempting again to cover his tracks, responded *"I didn't even hear you say [that]."* (Emphasis added). As stated above, Pickard's eagerness to perform unlawful financial services for a gunsmuggler belies any notion that he was entrapped.

During the next month, Pickard, demonstrating how well organized and prepared he was, sent Hinch a fee schedule for the service he was providing and requested Hinch's social security number and a "release" to perform the background check to determine whether Hinch was a government agent. On March 29th, during a phone conversation, Pickard sought assurance that Hinch was not working for the "Internal Revenue, the Treasury Department or any branch of the federal government." Hinch assured Pickard he was not. On April 3rd, Pickard and Hinch met in Indianapolis, Indiana for the first transaction in which Pickard had his stock broker wire $20,000 into Hinch's bank account in exchange for $20,000 in cash. Pick-

---

**6.** Agent Rothrock did in fact have a microphone on his person but Pickard did not discover it. This encounter, along with every other phone call and meeting was recorded. Thus, the jury heard not just the agent's recounting of the conversations but the actual conversations on tape. Some of the subsequent meetings were video taped as well. This evidence, along with the other circumstantial and direct evidence convinced the jury beyond a reasonable doubt of the defendants' guilt of each and every element of the crimes charged: structuring a currency transaction and money laundering.

ard also received $2405 for his ten percent fee and $405 in expenses. During this meeting, *Pickard expressed his concern that he didn't want to end up in jail as a result of this transaction.* Once again, this statement is contrary to the majority's appraisal that Pickard was a "tyro" who did not know money laundering was unlawful.

The scenario of exchanging cash for a wire transfer was repeated once again on April 18th, this time with defendant Hollingsworth and Hinch, involving $30,000 and a fee of $3,405 (10% plus $405 for expenses). On May 21st, Hinch met with Pickard and Hollingsworth in Fayetteville, Arkansas to discuss larger transactions in the future as well as Hinch's concern as to the method they were using to convert the money. Pickard and Hollingsworth assured Hinch they were being most careful converting the cash.

Having appeased Hinch's concerns, on June 21st, Pickard drove to Indianapolis again to pick up $50,000 in cash from Hinch in exchange for $50,000 he had arranged to be wired into Hinch's account. For this transaction, Pickard charged a flat ten percent fee. *Pickard once again sought assurances* from Hinch that he was not a government agent and that the cash was not the proceeds from drug sales. Pickard, like most clever white collar criminals, expressed a reluctance to dealing with Hinch because "he did not know who he was dealing with" but never a reluctance to engaging in unlawful money laundering.

On July 19th, Pickard and Hinch met in Indianapolis to exchange $100,000 in cash for a bank wire of $100,000 into Hinch's account. Pickard demanded a flat nine percent fee. In a telephone conversation on August 16th, Pickard, the "unwilling," "innocent" "neophyte," expressed an eagerness to handle larger and larger transactions. In the conversation he used the term "smurfing," which Agent Rothrock testified "is a slang term, and indicates taking units of money, for example ten thousand dollars, and breaking it down into units under ten thousand and going around to different financial institutions and turning those smaller units into cashier's checks and money orders."

Finally, on September 13, 1991, Pickard, still eager and aggressive, arrived in Indianapolis to engage in a $235,000 money laundering transaction with Hinch. During the course of the meeting, Pickard sketched the outline of his plans for creating a check cashing business to launder the money and also displayed to Hinch his phony passport from the "Dominion of Melchizedek" in the name of John Wesley Pickard.[7] After the $235,000 was wired into Hinch's bank account, Pickard and Hollingsworth were placed under arrest.

The evidence in this case bears little, if any, similarity to the facts in *Jacobson.* In that case, the government initiated repeated contacts with the defendant over the course of twenty-six months. In the case before us, it was Pickard and Hollingsworth who actively pursued the government agent and made the numerous phone calls to him. It was Pickard who sent correspondence to Hinch on four separate occasions selling his services. It was Pickard who initially raised the prospect of avoiding the federal reporting requirements for transactions over $10,000. It was Pickard who evidenced a knowledge of money laundering through his use of jargon such as "cleaning and polishing" and "smurfing" cash. This is in contradiction to the majority's presentation of the defendants as novices ("tyros"), uneducated in the ways of money laundering. The majority, in an attempt to justify their creation of a new element in entrapment cases, suggests that because "the line between evading and avoiding regulatory requirements is a fine one," the defendants may not have knowingly crossed the line. The only problem is that the jury did not buy the defendants' sales pitch that they unknowingly crossed the line. "It is not the function of this court to reweigh the evidence or to substitute its judgment for that of the trier of fact." *Dugan v. United States,* 18 F.3d 460, 463 (7th Cir.1994) (quoting *United States v. Wisniewski,* 741 F.2d 138, 144 (7th Cir.1984)). The defendants

---

**7.** John Wesley Pickard was the name of the defendant's brother who died seven days after birth.

clearly knew the transactions they were engaging in were unlawful or they would not have (1) obtained (on their own initiative) false identification and false passports, (2) inquired time and again whether Hinch was a government agent, (3) conducted a background check of Hinch, (4) performed "patdown" searches, nor (5) claimed to have "tap lights" on phones. The evidence that the defendants knew the transactions were unlawful could not be anymore overwhelming and is plainly in contradiction to the majority's unsupported statement that "there is no evidence that [Pickard] realized that 'structuring' a large cash deposit to avoid federal reporting requirements would also violate the law."

It is evident from the facts presented at trial that the defendants were quite well versed in how to launder money and expressed no reluctance at doing so. As the deal unfolded and additional details became known to Pickard, such as the fact that the cash was derived from illegal smuggling of arms into South Africa and Yugoslavia, Pickard was unfazed, in fact, he proceeded full-speed ahead expressing an interest in laundering larger amounts of cash. Any hesitancy to do business with the gun-smuggling Hinch was not a fear of breaking the law, but rather a fear of apprehension. The defendants' actions are not those of an "unwary innocent" but rather those of a *wary* criminal. *See Mathews,* 485 U.S. at 58, 108 S.Ct. at 883.

The fact that Rothrock's check of Pickard's record revealed no prior offenses does not in itself mandate that the investigation should have ceased. Merely because he hadn't been caught might just as likely suggest Pickard was an intelligent crook as it would that he was not a criminal at all. It seems to me that the fact Pickard and Hollingsworth came up with the illegal plan to launder Hinch's cash, that they never mentioned much less attempted to back out of the nepharious money laundering scheme even though they knew Hinch's money was "dirty," and the fact that *they* created, planned and organized the whole system of laundering the currency, is more than enough evidence from which a jury could

conclude beyond a reasonable doubt that the defendants were predisposed to commit the crime. *Blackman,* 950 F.2d at 423 ("view[ing] the evidence in the light most favorable to the government[,] [we] must affirm the conviction if we find that a rational trier of fact could have found the requisite predisposition beyond a reasonable doubt").

Thus, under our Circuit's five-part test for determining predisposition, *e.g., Cervante,* 958 F.2d at 179, the defendants fall far short of establishing a lack of predisposition under four of the five factors. The *suggestion of criminal activity was initially made and actively pursued by the defendants,* not the government. Second, the defendants were engaged in criminal activity for profit. Third, they never demonstrated a reluctance to commit the offense which was only overcome by government persuasion and fourth, the government did not offer any inducement to commit the crime. *Id.* As stated above, the "most important factor . . . is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement." *United States v. Kaminski,* 703 F.2d 1004, 1008 (7th Cir.1983); *accord Casanova,* 970 F.2d at 375 (applying same test post-*Jacobson*). Under no circumstances do the facts in this case, demonstrate reluctance on the part of the defendants that was overcome with repeated government inducement. In this case, the defendants were not reluctant to engage in criminal activity and there was no inducement; the government merely presented the defendants with an opportunity to commit a crime (as they do in all "sting operations"), an opportunity that a law-abiding citizen would have refused. The record supports only one rational conclusion—the conclusion reached by the jury after hearing all the evidence and weighing the credibility of the witnesses—that the defendants were guilty of the crime charged and were not entrapped.

The majority relies, in part, on an elaborate hypothetical involving government agents setting up a counterfeiting scheme and recruiting a willing, though unschooled in counterfeiting, individual to press the button and print the phony dollars. While the

strawman that the majority creates to make its point might very well have an argument that he was entrapped, the hypothetical bears no resemblance to the factual situation presented in the case before us. In the instant case, it was the defendants who proposed the unlawful transactions, it was the defendants, not the government agents, who devised the scheme to launder the money, and it was the defendants who engaged in all the precautionary measures to avoid apprehension for they well knew it was illegal. In short, after the initial phone call placed by Agent Rothrock, it was the defendants who brought about this unlawful money laundering scheme while reaping their illegal profits.

This case is really quite similar to another decision of this court written by the author of the majority, *United States v. Evans*, 924 F.2d 714 (7th Cir.1991). *Evans*, however, involved a drug transaction and the decision was issued pre-*Jacobson*. In *Evans*, we stated,

> "The centrality of predisposition can be seen by considering the purpose of the doctrine of entrapment. It is to prevent the police from turning a law-abiding person into a criminal.... A law-abiding person is one who resists the temptations, which abound in our society today, to commit crimes. Such a person can be induced to commit a crime only by grave threats, by fraud (the police might persuade him that the act they want him to commit is not criminal), or, in the usual case in which entrapment is pleaded, by extraordinary promises—the sorts of promises that would blind the ordinary person to his legal duties."

*Id.* at 717 (citations omitted). The majority suggests that after *Jacobson*, we must also consider whether the defendant was in the "position" to commit the crime absent "government help." As discussed above, in *Jacobson* the Court was not concerned with the defendant's positioning (or "readiness" as referred to in Judge Ripple's dissent), but rather with the fact that the government's inducement campaign lasted over twenty-six months and the defendant's ultimate willingness to purchase the unlawful child pornography was in large part due to the govern-

ment's repeated persuasive efforts. The Court emphasized in *Jacobson* that the defendant had "been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations. Therefore, although he had become predisposed to break the law by May 1987, it is our view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985." *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1541. The fact that Jacobson was "an otherwise law-abiding citizen" is not dispositive because the Court emphasized that "[h]ad the agents in this case simply offered petitioner the opportunity to order child pornography through the mails, and petitioner—who must be presumed to know the law—had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." *Id.* What is important in this type of entrapment case is not the defendant's "position" or "readiness," but whether the government went to great lengths (26 months of inducement) to prepare the defendant to take the bait. As explained above, the facts in our case bear little or no resemblance to *Jacobson*. Moreover, defendants Pickard and Hollingsworth were ready, willing, able, eager, and in fact jumped at the opportunity, to violate the law.

Pickard and Hollingsworth, the "tyros," laundered $435,000 over the course of six months. Far from being novices who were entrapped by overzealous government agents, they demonstrated that they knew what they were doing and were in fact quite proficient at it. Accordingly, the jury's finding of guilt beyond a reasonable doubt should not be overturned. *See Mathews*, 485 U.S. at 63, 108 S.Ct. at 886.

DISSENT.

EASTERBROOK, Circuit Judge, with whom COFFEY, Circuit Judge, joins, dissenting.

I join parts I and III of Judge Ripple's opinion, which demonstrates that the majority's "readiness" or "ability" requirement cannot be located in the Supreme Court's cases

and ought not be created of our own volition. I also join Judge Coffey's opinion analyzing the evidence in this case. I am less certain than Judge Ripple that the majority errs in recognizing a defense of "derivative entrapment" (at 1204) and therefore do not join part II of Judge Ripple's opinion. The majority expressly rejects any defense of "private entrapment" (*id.* at 1203) and implies that there is no defense of "vicarious entrapment." The defense of derivative entrapment, according to the majority, rests on recognition that one private person may be the government's agent for purposes of entrapping another; we regularly treat informants in this way. That a particular person did not receive a grant of immunity and therefore turned up as a defendant cannot exclude the possibility that he was the government's tool (unbeknownst to himself) for some purposes.

To the extent the majority believes that this imputation is obligatory—that whenever one defendant prevails on an entrapment defense, his henchmen win too because the alternative is "the absurdity of acquitting the principal while sending the agent to prison" (at 1204)—the decision conflicts with *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980), which rejects the argument that acquittal of the principal malefactor automatically blocks conviction of aides and assistants. Inconsistent verdicts are permissible in criminal cases. *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The majority's failure to discuss whether the evidence shows that Pickard acted as the government's agent, and in this role entrapped Hollingsworth (both elements are vital to an entrapment defense), suggests that it is following the path barred by *Standefer.* I do not delve into the Pickard–Hollingsworth dealings, however, for the evidence permitted a rational jury to conclude that Pickard himself was not entrapped.

*Jacobson v. United States,* —— U.S. ——, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992), which the majority invokes to justify its novel treatment of entrapment, purported to leave this corner of the law as the Court found it. To this the majority replies that common law

courts sometimes alter the law while maintaining a façade of continuity. Doubtless this is true, but more often language tracking prior law means that nothing has changed. Sometimes the Supreme Court issues a writ of certiorari only to conclude, after more reflection, that doctrine should be preserved. Everything then is just as it seems. (As Freud put it, sometimes a cigar is just a cigar.) Judges of an inferior court do best to take doctrine seriously, to treat the Justices as honest expositors. Every opinion contains language slightly different from its predecessors, if only for the sake of elegant variation. Isolated phrases do not alter the law when the bulk of an opinion professes otherwise. Stability and consistency among the hundreds of judges on the trial and appellate benches have substantial benefits. A relatively formal treatment of the Supreme Court's opinions better promotes evenhanded administration of justice than does a willingness to infer change from opinions reiterating old rules. After all, what six judges of this court see in *Jacobson,* five others think a mirage. As we approach a thousand judges on the federal courts, such differences in visual acuity have the potential to transmute Norman Rockwell's view of the world into Joan Miró's.

The panel conceded that "[a] reasonable jury would have found Pickard and Hollingsworth 'predisposed' *if* the term refers merely to a psychological state of willingness to break the law." 9 F.3d 593, 599 (1993) (emphasis in original). Indeed so. Pickard did not blanch when "Hinch" made it clear that he wanted to launder some money; instead Pickard asked what kind of work Hinch had in mind—whether Hinch wanted to "clean and polish" cash or sought "extended services". Pickard quoted a schedule of prices far exceeding those banks charge for legitimate transactions and expressed only a criminal's natural wariness at dealing with a person he hardly knew. Even then the wariness took the form of seeking a defense to criminal liability rather than a legal outlet for his energies. He asked Hinch whether he was an agent or informer, expressing the view that the answer "no" would set up an entrapment defense. When Pickard and Hinch met, Pickard was carrying a passport issued

by the "Dominion of Melchizedek"—an ally of the Duchy of Grand Fenwick?[1] The passport shows that Pickard was ready, willing, and able to commit at least one crime without federal prompting or assistance.[2] Reasonable jurors could conclude that he was anxious to add financial crimes to the list, if the ratio of profit to risk was right.

My colleagues in the majority treat Pickard as a pathetic figure. Perhaps he is. Police are better at nabbing bumblers than accomplished criminals. Being a novice caught on an initial sally into crime is no defense, however. There is a booming private market in currency offenses; Pickard could have entered this business, as do most currency offenders (including many with less intelligence and capital), without governmental aid. Often the best safeguard is to nab a person at the outset of a criminal career— even, under statutes such as 21 U.S.C. § 846, a person who has agreed to commit a crime without taking so much as a single step toward its accomplishment. *United States v. Sassi*, 966 F.2d 283 (7th Cir.1992). Wise prosecutors may throw the harmless fish back. Judges lack an equivalent power.

RIPPLE, Circuit Judge, with whom BAUER, COFFEY, and KANNE, Circuit Judges, join, dissenting and with whom EASTERBROOK, Circuit Judge, joins in Parts I and III.

By today's decision en banc, the majority alters in two major respects the law of entrapment. Although articulating its decision in more subtle terms than were employed in the earlier panel decision, the holding of the court can hardly be characterized as an incremental shift in perspective or as a clarification of minor nuance to established doctrine. Rather, the majority today adds a distinct burden for the government to carry and, with respect to so-called derivative entrapment, recognizes a doctrine not accepted

previously in our circuit or, for that matter, in almost any circuit. The majority thus has departed radically from the established law of this circuit, and, more importantly, from the governing precedent of the Supreme Court of the United States. The burden that this new approach will impose on legitimate law enforcement efforts will be substantial.

Over the last several decades, the Supreme Court has expended a great deal of judicial energy in formulating the governing principles of entrapment law. As this circuit noted in *United States v. Fusko*, 869 F.2d 1048 (7th Cir.1989):

> The basic law governing the affirmative defense of entrapment is well established. In *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court noted that it had "consistently adhered to the view . . . that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." 485 U.S. at 62–63, 108 S.Ct. at 886.

*Id.* at 1051.

The underlying policy concern that animates the doctrine has also been clear. As the present Chief Justice stated in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973):

> It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government.

*Id.* at 435, 93 S.Ct. at 1644. The Court has thus emphasized that the defense of entrapment was not meant to provide the federal

---

1. Melchizedek was the high priest and king of Salem who blessed Abraham. The Mormon Church uses his name for a higher order of its priesthood. Melchizedek has no temporal "Dominion."

2. Forging a passport violates 18 U.S.C. § 1543, which reaches foreign travel documents in addi-

tion to those issued by the United States. See *United States v. Osiemi*, 980 F.2d 344 (5th Cir. 1993). International money launderers think that bogus travel documents facilitate the offense. E.g., *United States v. Okayfor*, 996 F.2d 116 (6th Cir.1993). See also 18 U.S.C. § 1546.

judiciary with a device by which it might curb what, in the estimation of a particular judge or appellate panel, appears to be over-zealousness on the part of the Executive Branch in the prosecution under the criminal laws of the United States. As now-Chief Justice Rehnquist wrote in *Russell*:

> [T]he defense of entrapment ... was not intended to give the federal judiciary a "chancellor's foot" veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to the applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations.

*Id.*

### I

### "READINESS"

#### 1.

Today's decision introduces a new and independent hurdle for the government to surmount. No longer is it enough for the government to establish that the defendant was predisposed to commit the crime; it must now also establish his "readiness" to do so. The introduction of this new element into the entrapment doctrine alters both the doctrine and the policy concerns identified by the Supreme Court as animating that doctrine.

In *Russell*, Justice Rehnquist explained that, from the Court's first recognition of the entrapment doctrine in *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), "the thrust of the entrapment defense was held to focus on the intent or predisposition of the defendant to commit the crime." *Russell*, 411 U.S. at 429, 93 S.Ct. at

1641 (emphasis added). "Predisposition, 'the principal element in the defense of entrapment,' *Russell*, [411 U.S.] at 433, [93 S.Ct. at 1643], focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (quoting *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958); *Russell*, 411 U.S. at 436, 93 S.Ct. at 1645). That determination is based upon the intent of the defendant. A defendant is protected by that defense "[i]f the result of the governmental activity is to 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission.'" *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (quoting *Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212–13). Because predisposition concerns the defendant's state of mind at the time of the government inducement, it is usually an issue of fact for the trier of fact to decide. *Mathews*, 485 U.S. at 63, 108 S.Ct. at 886–87.[1]

The "readiness" of the defendant has an established role in the determination of whether a defendant is predisposed to commit an offense. It is circumstantial evidence that is relevant and probative evidence of whether the defendant was in fact predisposed to commit the offense. Indeed, the classic formulation of the predisposition factor, in the opinion of Judge Learned Hand in *United States v. Sherman*, 200 F.2d 880 (2d Cir.1952), treats the "ready and willing" conception in this manner.[2] This understanding was later implemented by the Supreme Court of the United States in a subsequent

---

**1.** Entrapment exists as a matter of law in two situations: when the factual evidence of entrapment is undisputed, *see, e.g., United States v. Martinez*, 979 F.2d 1424, 1429 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993); *United States v. Haddad*, 976 F.2d 1088, 1095 (7th Cir.1992); and when that evidence is insufficient to submit the issue to the jury, *see, e.g., United States v. Ortiz*, 804 F.2d 1161, 1164 (10th Cir.1986); *United States v. Jannotti*, 673 F.2d 578, 597 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Tritton*, 535 F.2d 359,

360–61 (7th Cir.1976). *See generally* Paul Marcus, *The Entrapment Defense* § 4.10, at 136 (1989).

**2.** Although Judge Hand is credited with creation of the phrase "ready and willing," this court and the Tenth Circuit used it in entrapment decisions prior to Judge Hand's ruling in *United States v. Sherman*. *See Ryles v. United States*, 183 F.2d 944, 945 (10th Cir.), *cert. denied*, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 637 (1950); *United States v. Markham*, 191 F.2d 936, 938 (7th Cir.1951).

appeal by the defendant. *Sherman v. United States,* 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).[3] The caselaw of the circuits has treated the concept in this way consistently. Predisposition may thus be established by evidence of the defendant's readiness or willingness to commit the offense. *See, e.g., United States v. Mendoza-Salgado,* 964 F.2d 993, 1002 (10th Cir.1992); *United States v. Ventura,* 936 F.2d 1228, 1230–31 (11th Cir.1991); *United States v. Alston,* 895 F.2d 1362, 1368 (11th Cir.1990); *United States v. Carrasco,* 887 F.2d 794, 814 (7th Cir.1989); *United States v. Shukitis,* 877 F.2d 1322, 1331 (7th Cir.1989); *United States v. Fusko,* 869 F.2d at 1052; *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985). *See also United States v. Hudson,* 982 F.2d 160, 162 (5th Cir.) (stating defendant's enthusiasm for crime can satisfy predisposition requirement), *cert. denied,* —— U.S. ——, 114 S.Ct. 100, 126 L.Ed.2d 67 (1993).

In similar fashion, the alacrity with which the defendant accepts the invitation is circumstantial evidence of his predisposition to commit the illegal act. Recently, the Supreme Court has reminded us that predisposition is demonstrated by the defendant's "ready commission of [a] criminal act." *Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1541, 118 L.Ed.2d 174 (1992) (citing *Sherman,* 200 F.2d at 882); *see also United States v. Kussmaul,* 987 F.2d 345, 349 (6th Cir.1993); *United States v. Tejeda,* 974 F.2d 210, 217–18 (1st Cir.1992). Predisposition can also be proven by a showing of the defendant's ready response to the inducement being offered. *Jacobson,* —— U.S. ——, 112 S.Ct. at 1543; *United States v. Jones,* 976 F.2d 176, 179 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2351, 124 L.Ed.2d 260 (1993); *United States v. Dozal-Bencomo,* 952 F.2d 1246, 1251 (10th Cir. 1991); *United States v. Sullivan,* 919 F.2d 1403, 1418 (10th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 285, 121 L.Ed.2d 211 (1992). In this sense, the defendant's preparation for the opportunity is no doubt relevant and probative on the issue of his predisposition. *See generally* Paul Marcus, *The Entrapment Defense* § 4.16, at 150 (1989). It is not, however, an independent element of the defense.[4]

Despite this well-settled approach to the concept of "readiness" in the controlling opinions of the Supreme Court and the consistent obedience of the courts of appeals to those mandates, the majority today takes this circuit outside the fold and establishes, within the boundaries of this circuit, a brand new role for the concept of readiness. By this decision, the majority treats "ready" as a new word of art. It has changed the "ready" defendant from one who is inclined, feeling or exhibiting no reluctance, to one on the point of acting. This massive alteration in the settled caselaw places this circuit at odds with the controlling caselaw of the Supreme Court and with the settled precedent in the

---

**3.** The original judgment of conviction was reversed by the Second Circuit in *United States v. Sherman,* 200 F.2d 880 (2d Cir.1952). The subsequent retrial resulted in judgment of conviction. That judgment was affirmed by the Court of Appeals at 240 F.2d 949 (2d Cir.1957). The Supreme Court reversed that judgment in *Sherman v. United States,* 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).

**4.** The Eighth Circuit gave a more detailed list of factors to be viewed in determining disposition. It included:

1) whether the defendant readily responded to the inducement offered;
2) the circumstances surrounding the illegal conduct;
3) "the state of mind of a defendant before government agents make any suggestion that he shall commit a crime;"

4) whether the defendant was engaged in an existing course of conduct similar to the crime for which he is charged;
5) whether the defendant had already formed the "design" to commit the crime for which he is charged;
6) the defendant's reputation;
7) the conduct of the defendant during negotiations with the undercover agent;
8) whether the defendant has refused to commit similar acts on other occasions;
9) the nature of the crime charged; and
10) "the degree of coercion present in the instigation law officers have contributed to the transaction" relative to the "defendant's criminal background."

*United States v. Dion,* 762 F.2d 674, 687–88 (8th Cir.1985) (citations omitted), *rev'd on other grounds,* 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986).

other circuits. For example, as the majority frankly acknowledges, the approach taken by the majority cannot live in peace with the holding of the United States Court of Appeals for the Second Circuit in *United States v. Ulloa*, 882 F.2d 41 (2d Cir.1989). In *Ulloa*, the trial court instructed that the government was required to prove that the defendant "was predisposed, or 'ready and willing,' to commit the crime before the informant's inducement." *Id.* at 43. Several times the jurors sent notes to the judge, asking him to explain what "ready" means. The judge stated: " 'Ready' implies an open amenability to it. It is not terribly different from 'willing.' The two of them together imply a certain amenability to be involved in illegal conduct." *Id.* at 44. The defendant appealed the court's interpretation, which equated "readiness" and "willingness." He asserted that the government was required to prove that the defendant *was not only willing but also ready to commit the crime, in the sense of having the present physical ability to do so.* The Second Circuit rejected this argument:

> The focus of the entrapment inquiry, once inducement by the Government is established, is on the defendant's state of mind.... [In our cases stating that the defendant was "fully prepared" to act,] we noted the defendant's physical readiness in order to demonstrate why the entrapment defense failed as a matter of law. *We did not say that the Government was required to prove readiness in this sense to sustain its burden in proving disposition.*

*Id.* (emphasis added).

As a result of this doctrinal transformation, conduct that every other court in the country considers to be within the permissible ambit of criminal proscription is, in the Seventh Circuit, beyond the reach of the criminal law. Although the Supreme Court has emphasized that the doctrine of entrapment is grounded in the judgment of Congress as to what conduct is so dangerous to the community as to invoke the sanction of our criminal laws, *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644, the majority makes no serious attempt to demonstrate that its new restriction on criminal prosecution is compatible with the intent of Congress in enacting the criminal code. More precisely, it makes no attempt to explain why a person who fully desires to break the law and is entirely willing to do what needs to be done to accomplish a criminal objective ought be excused from criminal liability simply because, for whatever reason, he does not have his act together when afforded an opportunity by an undercover agent. Instead, the majority justifies its change in the law of the Circuit squarely—and solely—on its interpretation of the Supreme Court's decision in *Jacobson*. Clarifying the position of the majority, the court now asserts that *Jacobson* significantly changed the law of entrapment and changed it in a way that necessitates the introduction of their new concept of "readiness" into entrapment analysis.

The first part of the majority's proposition can be accepted a lot easier than the second. Some decisions have acknowledged that *Jacobson* may well have some effect on the approach that courts take in implementing the traditional approach to entrapment. As Justice O'Connor suggested in her dissenting opinion in *Jacobson*, the Court's opinion may well have redefined the mental predisposition that will render useless the defense. The Justice pointed out that *Jacobson* seems to require that the government not only establish that the defendant had a pre-existing propensity to engage in the underlying conduct but also that he had the pre-existing propensity to violate the law in order to engage in that conduct. *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1546.

The alteration of entrapment analysis that Justice O'Connor identified in *Jacobson* is indeed a far cry from the massive alteration that the majority now reads into that holding. Notably, while the Justice's reading of the Court's opinion in *Jacobson* finds support in the text, the majority in this case must strain to claim any similar support. More precisely, the Justice's view that *Jacobson* requires that the defendant have the predisposition to violate the law sheds a plausible light on the *Jacobson* majority's closing statement that the doctrine of entrapment is applicable when "the Government's quest for conviction leads to the apprehension of an

otherwise law-abiding citizen who, if left to his own devices, likely would never have run afoul of the law." *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1543. While the majority here claims to find legitimacy for its view in the same statement, it fails to explain precisely how the Court's statement provides that support. Indeed, one can search the *Jacobson* opinion in vain for any indication that the Justices showed the slightest interest in bestowing upon the concept of predisposition "positional as well as dispositional force." Ante at 1199. The futility of such a search is not surprising. Assuming that *Jacobson* has made any enduring contribution to the caselaw of entrapment, it contains not the whisper of an echo of any suggestion that the courts are to second-guess Congress on the sort of conduct that warrants the invocation of our criminal laws.

### 2.

The transformation in the law of entrapment worked by the majority is not simply a theoretical doctrinal change. It is an alteration with significant practical ramifications. The majority opinion evidences a great deal of sympathy for the defendant who is not up to the task of sophisticated criminality. Until now, when the defendant raised properly the defense of entrapment, the government had the obligation to establish that the defendant committed the elements of the offense without having been provided an inducement by the government[5] and without the idea of criminality having been implanted by the government. Now the government must also demonstrate that the defendant has sufficient aptitude and equipment to commit the crime

and thus poses an immediate danger to society.

Because the majority takes this significant step in a case that does not present, from a factual point of view, the typical situation facing the modern federal prosecutor, the full impact of this new requirement may not be as apparent as it would be if the majority had chosen a drug or racketeering case in which to announce its new rule. The holding in this case, however, will benefit not only the pathetic incompetents of the criminal world but also the very competent criminal who is sufficiently studied in his way of doing business so as to appear not *too* organized.[6] This holding adds a whole new dimension to the arsenal of the mainstream drug trafficker and the traditional racketeer. For instance, it will provide first-rate arrest insurance for the occasional drug trafficker who, willing to ply his trade whenever the opportunity presents itself, is still not quite sufficiently organized when the opportunity is provided by the undercover agent. Initial reluctance in a drug "buy" is not an atypical behavior pattern. As the majority appears to acknowledge, perhaps the most problematic application of the new rule will come when a sting operation attracts a very willing but also not very well organized or inept first offender. A defendant's prior arrests and convictions, as well as his previous associations with drug traffickers, are strong indications of predisposition. Without that past record, however, would the neophyte's quick reply to an agent's invitation to "talk business" count as predisposition? Would his agreement to distribute drugs show a willingness, but not a readiness? See *United States v. Olson,* 978 F.2d 1472, 1483 (7th Cir.1992), *cert. de-*

---

5. In this case, the majority's entrapment analysis focuses on the defendant's lack of predisposition to commit the charged conduct; for that reason there is no need for an inquiry into the government's inducement. See *United States v. Cervante,* 958 F.2d 175, 178 (7th Cir.1992). However, it should be noted that, in the face of a paucity of actual evidence of inducement, the majority presents considerable "innuendo evidence" of the government's coercion. The evaluation of this evidence was a matter for the jury which determined, apparently, that the agent offered Pickard an opportunity to launder money and he took it.

6. Defendants' claims that they were stupid or duped are not new to this court. *See, e.g., United States v. Neely,* 980 F.2d 1074, 1085–86 (7th Cir.1992) (finding no impropriety in prosecutor's statement that defendants tried to "dupe" hospital staff); *United States v. Johnson,* 927 F.2d 999, 1004–05 (7th Cir.1991) (rejecting defendant's claim that she was too unsophisticated to have requisite intent to defraud government); *United States v. George,* 869 F.2d 333, 334 (7th Cir.1989) (noting defendant's claim at sentencing hearing that court consider defendant's totally unsophisticated behavior). *See also Dozal–Bencomo,* 952 F.2d at 1251 (stating defendant "not the unwilling dupe he would have us believe").

*nied,* — U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174, 175 (1993).

There is, of course, no constitutional requirement that the Congress punish only activity that is *immediately* dangerous. Nor can the majority point to any expression by the Congress of such an intent. If such a criterion is appropriate, it is the members of Congress, not the judges of an intermediate appellate court, who ought to make that decision. *Russell* emphatically settles this question of our authority. 411 U.S. at 435, 93 S.Ct. at 1644. It must govern our decision today.

## II

## PRIVATE/VICARIOUS ENTRAPMENT

The majority also holds that Mr. Hollingsworth is, as a matter of law, protected from criminal liability by the defense of "vicarious entrapment." Here also, this decision charts a different course from almost all of the circuits and deviates from the course previously set by our decisions.[7] This circuit, along with every other circuit except the Second, has steadfastly held that there is no defense of private entrapment. *See United States v. Mahkimetas,* 991 F.2d 379, 386 (7th Cir.1993); *United States v. Jones,* 950 F.2d 1309, 1315 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992); *United States v. Manzella,* 791 F.2d 1263, 1269 (7th Cir.1986). Even the Second Circuit's decision in *United States v. Valencia,* 645 F.2d 1158, 1168–69 & n. 10 (2d Cir.1980), has been placed in doubt by the subsequent caselaw of that circuit. *See United States v. Pilarinos,* 864 F.2d 253, 256 (2d Cir.1988) (holding no derivative entrapment where middleman was induced by a government agent to commit crime, responding to pressure, takes it upon himself to induce another to participate in crime); *United States v. Toner,* 728 F.2d 115, 126–27 (2d Cir.1984) ("[T]here *is* a burden of showing that the government's inducement was directly communicated to the person seeking an entrapment charge."). So-called derivative or vicarious entrapment, like private entrapment, is not, and ought not be, recognized as a defense. *United States v. Marren,* 890 F.2d 924, 931 n. 2 (7th Cir.1989); *United States v. Buishas,* 791 F.2d 1310, 1314 (7th Cir.1986). "Without *direct government communication* with the defendant, there is no basis for an entrapment defense."[8] *United States v. Martinez,* 979 F.2d 1424, 1432 (10th Cir.1992),. *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993). Entrapment ought to succeed as a defense only if *the government* "implant[s] in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." *Hampton v. United States,* 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (quoting *Sorrells,* 287 U.S. at 442, 53 S.Ct. at 212–13). Either the government agent or official induced the defendant or he did not; a "vicarious entrapment" simply serves none of the policy concerns that justify the burden placed on the government by the defense of entrapment. Indeed, as presented by the majority, it excuses the illegal actions of an individual perfectly willing to break the law and well prepared to do so simply because the defendant has the good fortune to choose a partner in crime who has had improper contact with a government agent. If Congress wishes to allow such individuals to walk in our communities undisturbed, or if the Executive Branch declines to prosecute such

---

**7.** The decisions of other circuits holding that there is no defense of private entrapment include *United States v. Neal,* 990 F.2d 355, 358 (8th Cir.1993); *United States v. Goodacre,* 793 F.2d 1124, 1125 (9th Cir.), *cert. denied,* 479 U.S. 993, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986); *United States v. Leroux,* 738 F.2d 943, 947 (8th Cir.1984) (collecting cases); and *United States v. Dove,* 629 F.2d 325, 329 (4th Cir.1980). Cases holding that the defense of vicarious or derivative entrapment is not recognized include *United States v. Martinez,* 979 F.2d 1424, 1432 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1824, 123 L.Ed.2d 454 (1993) (collecting cases); *United*

*States v. Buishas,* 791 F.2d 1310, 1313 (7th Cir. 1986); *Leroux,* 738 F.2d at 947; and *United States v. Mers,* 701 F.2d 1321, 1340 (11th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 482, 78 L.Ed.2d 679 (1983).

**8.** The First Circuit has suggested, albeit in *dicta,* that there may be circumstances when communication with the defendant through an intermediary at the instruction of a government agent would be sufficient. *United States v. Hernandez,* 995 F.2d 307, 313 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993).

individuals, those branches operate well within the ambit of their authority. Such determinations are quite different from the judiciary's use of the " 'chancellor's foot,' " *Russell,* 411 U.S. at 435, 93 S.Ct. at 1644, to nullify the decision of those branches to undertake such a prosecution.

## III

### CONCLUSION

This en banc proceeding sharply delineates the differences between the majority and the minority of this court on the issue of entrapment. It presents, in the most stark terms possible, two divergent views of the law of entrapment. More particularly, it presents a square difference of opinion among the judges of this court on the significance of the Supreme Court's opinion in *Jacobson.* It questions the continued vitality of *Russell.* The holding of the majority sets this circuit on a doctrinal course different from that of the other circuits. It presents, as the government notes in its petition for rehearing, a significant practical burden for law enforcement authorities. It is now for the Supreme Court to determine whether the doctrinal course that the majority has now set and the burden that it has imposed on law enforcement efforts are correct ones.[9]

---

**9.** As the majority notes, the defendants were convicted of unlawfully structuring a currency transaction for the purpose of evading the transaction reporting requirements of 31 U.S.C. § 5313, in violation of 31 U.S.C. § 5324(a)(3). In order to be subject to criminal prosecution for violating that statute, a person must "willfully" violate it. 31 U.S.C. § 5322(a). In *Ratzlaf v. United States,* — U.S. —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the Supreme Court of the United States held that this willfulness requirement mandates that the government prove, and the jury be instructed, that a defendant acted with knowledge that the structuring he undertook was unlawful. *Id.* at —, 114 S.Ct. at 663. The Supreme Court's holding in *Ratzlaf* is the controlling interpretation of 31 U.S.C. § 5324(a)(3) and must be given full retroactive effect. *See Griffith v. Kentucky,* 479 U.S. 314, 322, 107 S.Ct. 708, 712–13, 93 L.Ed.2d 649 (1987).

The jury instruction with respect to the unlawful structuring charge did not instruct the jury

that the government was required to prove that the defendants acted with knowledge that the structuring he undertook was unlawful. Prior to *Ratzlaf,* the instruction was correct under the law of this circuit. *See United States v. Jackson,* 983 F.2d 757, 767 (7th Cir.1993) (holding that "a criminal violation of § 5324(a)(3) may be established without proof that the defendant knew that structuring was unlawful"). There was no objection to the instruction at trial. Therefore, if this case were not to be dismissed entirely on entrapment grounds, we would be obliged to remand this case to the district court to determine whether the omission of this instruction constituted plain error. *See United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (citation omitted). A "plain" error is "clear" or "obvious." *Id.* at —, 113 S.Ct. at 1777 (citation omitted). In light of the majority's disposition of this case, we need not reach this issue.